Rohit Nath (316062)
rnath@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Phone: (310) 789-3100
Fax: (310) 789-3150

Shawn Blackburn
sblackburn@susmangodfrey.com
(*Pro Hac Vice Forthcoming*)
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002
Phone: (713) 651-9366
Fax: (713) 654-6666

*Attorneys for Plaintiff Chandler Wilkinson LLC*
*[See additional counsel on Signature Page]*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| CHANDLER WILKINSON LLC,<br><br>       Plaintiff,<br><br>   vs.<br><br>MICROSOFT CORPORATION,<br><br>       Defendant. | Case No.  26-2453<br><br>**COMPLAINT FOR TRADE SECRET MISAPPROPRIATION AND PATENT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Chandler Wilkinson LLC invokes the jurisdiction of this Court under 28 U.S.C. §§ 1331 and 1338(a) and alleges as follows:

**NATURE OF THE ACTION**

The global online advertising market is valued at $359 billion and is projected to grow to more than $1 trillion by 2034. But this massive market almost failed to get off the ground due to widespread fraudulent conduct known as "click fraud." In 2006, Microsoft internally reported that up to 16% of its advertising revenue was lost due

COMPLAINT

to fraud.

In 2005, Authenticlick, Inc.—a predecessor to the plaintiff in this lawsuit—developed a revolutionary technology to address click fraud. Unlike earlier industry efforts, Authenticlick's technology enabled assessment of the *quality* of web traffic using advanced and varied metrics—departing from a reductive binary fraudulent/not-fraudulent analysis. This helped advertisers ensure they only paid when advertisements were seen by real consumers.

In 2006, Microsoft was desperately looking for solutions to the click fraud problem, but it lacked the internal knowledge or experience to develop a state-of-the-art technology. After trying and failing to hire Authenticlick's Chief Science Officer—and leading click fraud expert—Dr. Vincent Granville, Microsoft pursued Authenticlick's technology directly. From 2006 to 2008, Microsoft represented to Authenticlick that it was exploring a potential business partnership. Based on that representation, Authenticlick provided Microsoft with proprietary software, data, code, and technology.

But behind the scenes, the same Microsoft engineers that were supposedly "evaluating" Authenticlick's technology were using that technology to build Microsoft's own click evaluation system. On information and belief, Microsoft "rolled out" Authenticlick's technology internally beginning in July, 2007 but continued stringing Authenticlick along (using it for advice and technical support) until March, 2008, when Microsoft rejected Authenticlick, claiming that Microsoft

COMPLAINT

had "gone ahead with building their [own] scoring interface and are currently using Microsoft's click scoring."

Microsoft's click fraud detection and prevention technology is based on Authenticlick's trade secrets provided for limited evaluation purposes and obtained under the guise of a business partnership. Microsoft's click fraud detection and prevention technology also infringes patents held by Plaintiff Chandler Wilkinson LLC. Chandler Wilkinson now holds all claims and intellectual property from Authenticlick, Inc. and brings this action for trade secret misappropriation and patent infringement against Defendant Microsoft Corporation based on the following allegations.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, and the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.* The Court also has supplemental jurisdiction over Plaintiff's California Uniform Trade Secrets Act claim under 28 U.S.C. § 1367.

2. This Court has personal jurisdiction over Microsoft because Microsoft conducts business and has committed acts of patent infringement in this District and in the State of California as set forth below. Venue is also proper in this District pursuant to 28 U.S.C. § 1400(b) because Microsoft has regular and established

COMPLAINT

physical places of business in this District, has committed acts of patent infringement in this District, and committed trade secret misappropriation in this District.

3.     Microsoft employs hundreds of people in the State of California. It maintains at least two offices within this District: one in Los Angeles, California, and one in Irvine, California.[1] The Los Angeles office—at 13031 West Jefferson Blvd., Suite 200, Los Angeles, CA 90094—is in the Western Division of this District. Microsoft's Los Angeles office houses Microsoft employees working on "sales, marketing, and *advertising*."[2]

4.     The trade secret claims arise out of Microsoft's contact with this District. Between 2006 and 2008, when Microsoft and Authenticlick were working together (or so Authenticlick believed), Authenticlick was headquartered at 5757 Wilshire Boulevard, Penthouse One, Los Angeles, CA 90036. Microsoft purposefully and voluntarily engaged in business discussions with Authenticlick, knowing that Authenticlick was headquartered in this District.

5.     Upon information and belief, Microsoft has purposefully and voluntarily entered into commercial arrangements with the expectation that advertisements will be viewed—and products will be purchased—in this District. By

[1]  Microsoft, *Microsoft U.S. Office Locations*, https://www.microsoft.com/en-us/hub/locations (last accessed March 5, 2025). On information and belief, Microsoft still maintains a corporate office on West Jefferson Boulevard.
[2]  Los Angeles Business Journal, *Microsoft Opens Playa Vista Office*, https://labusinessjournal.com/technology/microsoft-opens-playa-vista-office/ (Sept. 6, 2013) (last accessed December 1, 2025) (emphasis added).

COMPLAINT

doing so, Microsoft has used anti-click fraud technology built on misappropriated trade secrets and infringed patents in this District.

6.     Microsoft is subject to this Court's general and specific jurisdiction pursuant to due process and/or the California Long Arm Statute due to Microsoft's substantial business in California and this District, including its past and ongoing infringing activities and misappropriation of trade secrets. Microsoft regularly does and solicits business herein, and/or has engaged in persistent conduct and/or has derived substantial revenue from goods and services provided in California and this District.

7.     Venue is likewise proper in this District pursuant to 28 U.S.C. § 1400(b) because Microsoft has regular and established physical places of business in this District and has committed acts of trade secret misappropriation and patent infringement in the District.

## THE PARTIES

8.     Plaintiff Chandler Wilkinson LLC is a Delaware limited liability company. Chandler Wilkinson is wholly owned and controlled by Joel Berman, one of Authenticlick's co-founders. After Authenticlick went out of business in 2008, Berman purchased all of its assets, including its intellectual property, and any claims

COMPLAINT

arising from them. Berman later assigned these assets and claims to Chandler Wilkinson.

9.      Defendant Microsoft Corporation is a Delaware corporation with an office at 3 Park Plaza, Suite 1600, Irvine, CA 92614 and, on information and belief, at 13031 West Jefferson Blvd., Suite 200, Los Angeles, CA 90094. Microsoft has been registered to do business in the State of California since October 29, 1993.

**FACTUAL ALLEGATIONS**

**I.      CLICK FRAUD THREATENED THE ECONOMIC VIABILITY OF INTERNET ADVERTISING**

10.      Authenticlick, Inc. was co-founded in Los Angeles in 2005 by Michael Leonard (Chief Executive Officer), Joel Berman (originally Chief Financial Officer), and Dr. Vincent Granville (Chief Science Officer) to address a costly and endemic problem in internet advertising: click fraud.

11.      The click fraud problem is this: advertising networks charge advertisers on a pay-per-click (PPC) or pay-per-impression (PPI) basis. In other words, the advertisers pay the networks each time their ad is either clicked (PPC) or viewed (PPI). This advertising model is premised on the understanding that clicks and views reliably translate to sales—or, at the very least, visits to the advertisers' websites. As Brendan Kitts—a Microsoft employee and central figure in this story—explained in a 2013 publication: "This is an ingenious system which works great as long as the clicker is a person. But there's just one fatal flaw. What if the person clicking on the

COMPLAINT

ads isn't a person after all?" Brendan Kitts, *The Making of a Large-Scale Online Ad Server*, at 1 (Dec. 2013) (hereinafter "Kitts, 2013").

12. Worthless clicks/views fall into at least three categories: 1) clicks by bots; 2) clicks generated by malicious actors, like competitors who wanted to increase advertisers' costs; and 3) inadvertent clicks, or clicks otherwise unlikely to convert to website views or product sales. Worthless clicks or pseudo-views threatened the viability of online advertising because advertisers could not tell whether the clicks or views—which they paid for—represented real potential customers. As Kitts explained, publishers could "start clicking on their own ads to produce more cash payouts. A sufficiently motivated publisher could treat an unprotected pay per click system like a 'printing press' to print their own money." Kitts, 2013, at 1. This degraded the foundational trust underlying the PPC and PPI advertising models.

13. Around 2006, click fraud loomed as an epidemic that would threaten the internet economy. In January of 2006, researchers reported that somewhere between 10% and 50% of all clicks were fraudulent.[3] One widely cited study put the figure at

---

[3] Charles C. Mann, WIRED, *How Click Fraud Could Swallow the Internet* (https://www.wired.com/2006/01/fraud/#:~:text=The%20amount%20of%20click%20fraud,and%20mouse%20with%20its%20perpetrators) (Jan. 1, 2006) (last accessed December 25, 2025).

COMPLAINT

29.5%. Google's Chief Financial Officer commented in 2005 that "something has to be done about this really, really quickly" because "it threatens our business model."

14.    Click fraud specifically threatened Microsoft's nascent internet search and advertising business. Around 2006, Microsoft research showed that up to 16% of its total advertising revenue was lost to fraud. Kitts, 2013, at 3. In January, 2007, Microsoft told Authenticlick that it received roughly 5000 "transactions" per second.

15.    As Microsoft's now-president Brad Smith explained in 2010, Microsoft was "uniquely positioned to help address the problem of click fraud … given our role in the industry and our deep expertise in addressing safety on the internet." But in 2006, Microsoft had not come up with a reliable click fraud solution and was searching for answers. That is why Microsoft needed Authenticlick.

## II.    AUTHENTICLICK DEVELOPED A NOVEL TECHNOLOGY TO ADDRESS THE CLICK FRAUD PROBLEM

16.    While Microsoft was struggling with click fraud, Authenticlick was developing a unique solution, using context-specific rulesets to determine whether clicks were high- or low-quality. This marked a departure from prior click fraud-prevention technology, which used a reductive (and much less accurate) binary sorting system to categorize clicks as "fraudulent" or "non-fraudulent."

17.    Authenticlick's approach began with direct advertiser communication, allowing each advertiser to define their engagement goals—that is, determine the quality of clicks or impressions they were willing to pay for. Authenticlick then sampled the customer's traffic data to identify desired clicks and generate applicable

8

rule sets that captured those desired clicks. After coordinating on engagement goals and applicable rule sets, Authenticlick created regular expressions for identifying and analyzing future clicks. Authenticlick used machine learning and data sampling techniques to assign weights to each rule capturing the desired traffic for each advertiser (or publisher site). It also added rules reflecting industry-specific and client-specific patterns and trends.

18.     Moving forward, when customers provided web log data, Authenticlick would apply the unique rule blend to each batch of data, developing scores based on the rule sets. It would then provide reports to customers, reconciling data by keyword, time interval, distribution partner, and other metrics; in short, showing customers the quality of traffic on their advertisements.

## III.   MICROSOFT APPROACHES AUTHENTICLICK PURPORTING TO WANT TO COLLABORATE ON CLICK FRAUD

19.     By September 2005, Microsoft had launched MSN adCenter—a "Sponsored search system that show[ed] advertising in response to search queries typed by users." But Microsoft's nascent adCenter was struggling due to click fraud.

20.     On October 6, 2005, a Microsoft employee named Jody Biggs invited Authenticlick's Chief Science Officer, Dr. Granville, to apply for a position working on Microsoft's click fraud problem. Dr. Granville was (and is) a leader in data analytics and click assessment; he holds a PhD in mathematics and statistics, has published more than 40 papers in statistical journals, and is a pioneering data scientist and machine learning expert. Biggs explained that Microsoft needed a "very

9

technical individual with a strong background in statistics/probabilistic learning techniques" to "drive the specification, design, development, and performance of MSN's click fraud detection system" and address the "fraud vs. fraud detection arms race."

21. Dr. Granville declined Microsoft's invitation. In January, 2006 Microsoft hired Brendan Kitts as Microsoft's "lead Program Manager dealing with Invalid Clicks." But Kitts' team was struggling to solve the click fraud problem alone. In a later-published book chapter, Kitts and other Microsoft engineers later explained at least two of the reasons: first, unlike Authenticlick's technology, Microsoft's existing technology "physically discard[ed] records as soon as they underwent certain quality tests." Brendan Kitts, et al., *Click Fraud Detection: Adversarial Pattern Recognition over 5 Years at Microsoft*, in *Real World Data Mining Applications*, at 183 (Abou-Nasr ed., 2015) (hereinafter "*Data Mining* chapter*"). This created concern that adCenter was "dropping traffic," which required repeated "detailed, manual investigation." *Id*. It also made it difficult to "update the filtration logic," because there were no negative inputs (meaning the system couldn't learn by studying *bad* clicks). Microsoft's dispersed system—which scattered fraudulent traffic-flagging logic "across different systems"—also required changes to "multiple systems" any time an update was necessary, which made testing difficult. *Id*.

22. Stuck with its own ineffective system and without a path forward, Microsoft once again contacted Dr. Granville in July 2006. Jenifer Handler, a Product Manager in Microsoft's Digital Advertising Solutions Group, contacted Granville about his "ideas/progress regarding invalid clicks in the search marketing world."

23. Granville responded on July 25, 2006, explaining that he was Chief Science Officer at Authenticlick. He asked if Handler would be interested in discussing Authenticlick's involvement in developing "a click fraud solution that only Microsoft could implement because you own [Internet Explorer]," and asked to include Michael Leonard, Authenticlick's CEO. Handler agreed to bring Leonard into the conversation and sent Authenticlick a mutual non-disclosure agreement (NDA), which Granville executed and returned the next day.

24. Authenticlick consistently required an NDA any time it began discussing its technology with a new prospective customer.

25. On July 27, 2006, Granville told Handler that Authenticlick was preparing to file a patent on a click scoring system focused on Internet Explorer—Microsoft's web browser.

26. Granville and Kitts had an initial phone call. On October 30, 2006, Granville reported that the conversation was "essentially technical, a bit surprising in the sense that I wasn't asked any questions about the business model nor click fraud nor metric selection (nothing about 'domain expertise'), but just general data mining methodologies . . . They are looking for a pure technical traditional guy in my

11

COMPLAINT

opinion." Granville opined that this was a good thing for Authenticlick because Microsoft would "not succeed in building the right product, and will need people like us."

27.    On November 13, 2006—just weeks after the Microsoft/Authenticlick call—Microsoft (through Kitts) began filing patents on click fraud technology knowing that Authenticlick was proceeding with filing its own patents (as Granville told Handler several weeks earlier). The United States Patent and Trademark Office later denied Kitts's U.S. Patent Application 2008/0114624—including on the ground that the claims were unpatentable over "Granville 20070192190."

28.    If Authenticlick had known that Microsoft was trying to patent similar technology (and, as would be revealed later, incorporate Authenticlick's trade secrets into its own products), Authenticlick would not have provided Microsoft with an early overview of its technology or proceeded with the proposed business arrangement. But Authenticlick, unaware of Microsoft's motives, proceeded to engage with Microsoft. On November 3, 2006, Corey Rosemond—the Microsoft Business Development employee involved with Microsoft's adCenter—reached out to Dr. Granville asking for 30 minutes to "understand your technology." On November 15, Dr. Granville and Leonard met with Microsoft employees to discuss Authenticlick's proprietary approach to click scoring.

29.    Kitts followed up the next day. He emphasized Microsoft's interest in evaluating Authenticlick's scoring system, and asked Authenticlick to send IP scores

12

—results from Authenticlick's click scorer—so that Microsoft could "validate that against our existing data set." To motivate Authenticlick, Kitts asked them to "come up with pricing" details because Microsoft "may be interested in a subscription arrangement where we sign up with [Authenticlick] for a particular period of time."

30.    Leonard responded the next day, encouraged by Microsoft's interest in a business partnership. He explained that Authenticlick had a fee schedule in place and offered to send Microsoft a proposal quoting prices. Around December 6, 2006, Authenticlick provided Microsoft with a 25-page Technical Proposal (the "Proposal").

31.    The Proposal outlined the challenges associated with Microsoft's advertising model and Authenticlick's unique capacity to resolve those issues. It provided a 12-step overview of Authenticlick's process for scoring clicks. Designated "proprietary and/or confidential," the Proposal detailed technical aspects of Authenticlick's solution, like pulling data from web logs, determining advertiser-specific rule sets for scoring click quality, assigning scores to each click, and allowing the client to determine the score threshold for compensating the search platform for each click. The Proposal expressed Authenticlick's understanding that it would be "assist[ing] Microsoft in achieving [its goals relating to click fraud] and in developing a strong business partnership."

32.    The Proposal provided a high-level view of how the technology functioned but omitted key details. For instance, when explaining how clicks were

COMPLAINT

ultimately scored, the Proposal simply outlined a "[c]omplex system involving from 100,000 configurations up to billions of configurations" developed through "extensive search engine and advertiser data analysis."

33.    On December 6, 2006, around when Authenticlick provided Microsoft with its Technical Proposal, Kitts created a Microsoft functional specification—a blueprint for technology that Authenticlick would provide to Microsoft—that he titled "Moonshot." The stated purpose was to facilitate development of a "Third Party Scoring application" that would be integrated into Microsoft's "adCenter system."

34.    It was no accident that Kitts named his functional specification "Moonshot." Moonshot was also Microsoft's internal code name for its own nascent search engine and paid search-ad system.[4]   That system allowed advertisers to pay Microsoft to associate advertisements with keyword searches and place advertisements on publisher websites. As discussed above, this business model relied on the premise that the clicks that advertisers paid for were real and high-quality.

35.    On information and belief, Kitts's Moonshot functional specification was designed to integrate Authenticlick's technology into Microsoft's Moonshot

---

[4] See Robert Guth, WALL STREET JOURNAL, *Microsoft Bid to Beat Google Builds on a                    History                    of                    Misses,* https://www.wsj.com/articles/SB123207131111388507?gaa_at=eafs&gaa_n=AWE tsqcXXWmhmYhGAHoJaixoXzHggggkAUAkeQIRxzefA0nWWDS-MsOE1H6E6iZKdc0%3D&gaa_ts=6993b53a&gaa_sig=qSI7VXk127VzRfMt1tU MSvla0GfYXQxz0cN2mxo7SmydCqEcDWOHTaprToesJuJsW6blOgOKVQfyLh Ptx0JSCA%3D%3D (Jan. 16, 2009) (last accessed February 16, 2026).

search engine and search-ad service, which needed Authenticlick's technology to function effectively.

36.    As Kitts had suggested in November, Authenticlick ran a test on Microsoft's data to prove the viability of its technology. It sent Microsoft click score samples from various Microsoft-provided IP addresses. Microsoft liked what it saw. Around January 8, 2007, Granville met with Microsoft representatives—including Kitts—in Las Vegas to discuss the IP scores. Granville recapped the meeting to Leonard, telling Leonard that according to Kitts, Authenticlick was "without any doubt the #1 vendor" as compared to several other click scoring vendors (including "internal MSN sources"). Authenticlick was the "only vendor to offer three different metrics per IP," and each of those three metrics "significantly outperformed competition." It was also the only vendor to "add value, measured as the proportion of additional bad clicks captured by the vendor's product."

## IV.    MICROSOFT INTEGRATED AUTHENTICLICK'S TECHNOLOGY DIRECTLY INTO MICROSOFT PLATFORMS

37.    On January 11, 2007, Kitts asked for technical help bringing Authenticlick's click scorer into Microsoft's platform. Kitts asked for "code that is very simple to deploy - ie. if we pass it an IP, useragent, date, time, [or] query, the scorer returns a score." He explained that the objective was to "hook up" Authenticlick's scorer and "validate that it is viable." This was a preview of the Moonshot functional specification that Kitts had started drafting in early December, 2006.

15

COMPLAINT

38.    Kitts's stated desire to integrate a click scorer into Microsoft's platform required a new agreement to cover the exchange of information. On January 22, 2007, Authenticlick and Microsoft entered into a six-month Evaluation License Agreement (the "ELA") prepared by Microsoft.

39.    Through the ELA, Authenticlick gave Microsoft a six-month "license to use and evaluate" the click scoring technology "**solely for evaluating its potential integration into Microsoft's adCenter platform**." It stated that "Microsoft may modify the Company technology only as necessary to evaluate and test its integration possibility into adCenter." The ELA "**d[id] not grant [Microsoft] any commercial development, marketing or distribution rights**" to Authenticlick's technology. On January 24, 2007, Kitts asked Authenticlick to provide its click scoring code in DLL format. DLL is a shared Microsoft library that contains executable code.[5] In his email to Authenticlick, Kitts attached the "Moonshot" functional specification (again, on information and belief, designed to facilitate incorporation of Authenticlick's technology into Microsoft's "Moonshot" search engine and search-ad service). The document outlined technical requirements, including that Microsoft needed the technology to be "robust to missing data." The Moonshot specification expressly encouraged Authenticlick to "**utilize their own proprietary and unique data sources and algorithms to produce high quality scores**."

_____

[5]    See Microsoft, *What is a DLL*, https://learn.microsoft.com/en-us/troubleshoot/windows-client/setup-upgrade-and-drivers/dynamic-link-library (accessed December 5, 2025).

16

COMPLAINT

**5.1.1.1 Information**

adCenter will

a) pass minimal information necessary for scoring to take place to Scoring Server.
b) data collected by Third party scoring server will not be passed back to Third Party
c) Third Party Scoring Server will run on an adCenter Data Center machine and will not be accessible to Third party.
d) Third Party Scoring Server will not have a dial-home functionality

Third Party Scoring code will be deployed in an adCenter-controlled Data Center, and no information flow back to the Third Party. The Third party is encouraged to utilize their own proprietary and unique data sources and algorithms to produce high quality scores.

40.    On February 22, 2007, Kitts sent Leonard an updated "Moonshot" specification with more detail on "the preferred API and construction"—outlining how Authenticlick should configure its technology to facilitate Microsoft testing and integration. Kitts also set up a call with Authenticlick to "discuss some of the finer points of preparing the scorer." He emphasized, among other things, that Microsoft was primarily focused on click scoring (not impression scoring), and encouraged Authenticlick to start developing a "wish list" of features it wished Microsoft's adCenter could pass to the scorer—further representing to Authenticlick that Microsoft was interested in a business partnership while simultaneously gathering information about which click scoring details Authenticlick saw as most useful.

41.    On March 13, 2007, Authenticlick delivered its code package to Microsoft—DLL code, test harness (code written to facilitate testing), and readme (instructions for using the code), followed shortly by example data and a how-to document explaining how to use the scorer and read the results.

42.    Over the next several months, Authenticlick provided extensive technical support as Microsoft integrated Authenticlick's technology. Authenticlick

17

COMPLAINT

also provided Microsoft's engineers with an updated click scorer DLL and offered instructions on how to integrate it to C++ code. Authenticlick's troubleshooting assistance included responding to error messages and advising on search term inquiries so that Microsoft could double check scores and corresponding inputs. Leonard and Granville even came to Microsoft's Redmond headquarters on April 16, 2007 to demonstrate the scoring module.

43.    Other Microsoft employees were simultaneously engaging with Authenticlick. On May 30, 2007, Microsoft's Mark Grote—a Product Manager within MSN's Online Services Marketing Group, had a call with Authenticlick engineer Liz Carrasco. Grote told Carrasco that he was on the same "task force" as Kitts (although he didn't specify what that task force was) and that he was working to investigate apparent click fraud that Microsoft was combatting as an advertiser (*e.g.*, on the buy side). Over the course of the next several months, Authenticlick provided Grote with significant technical information in addition to what it provided to Kitts and his group.

44.    On July 11, 2007, Kitts called Leonard to encourage Authenticlick. He left a voicemail explaining that the "[p]riority of the project has been elevated" and that Authenticlick's approach was "resoundingly compatible" with Microsoft's needs. Kitts said that he anticipated an October 15 release.

45.    On July 17, Kitts and Leonard had another call. Kitts said he would be sending Authenticlick requirements to integrate its technology into Microsoft's real-

COMPLAINT

time system, again anticipating an October 15, 2007 launch. After discussing some technical aspects of the project—including which company would provide machines hosting the scorer and how the technology would be integrated into Microsoft's platform—Kitts explained that "sophisticated advertisers love the idea. Agencies love the idea." Leonard requested deal terms on paper, and Kitts agreed.

46.    Shortly after, however, Kitts said that Microsoft was hesitant to pay Authenticlick directly, because it might create the appearance of a conflict. Kitts and Leonard agreed to meet in person to discuss the issue, but that meeting never materialized; Kitts never followed up.

47.    On September 7th, 2007, Grote followed up asking what Authenticlick's services would cost. He explained that getting Authenticlick signed up as a vendor would require "approximate pricing for the services rendered . . . " Authenticlick's Yoni Kahnrose responded that based on Authenticlick's "estimates of [Microsoft's] traffic volume, I believe you can expect something in the range of $.005 and $.01 per click."

48.    On September 21, 2007, Microsoft's Mike Chin—an employee in Microsoft's Business Development department—abruptly announced that Microsoft was moving forward with its own scorer. Chin hedged, though, reaffirming Microsoft's desire to work with Authenticlick and explaining that Microsoft's use of an internal scorer did not "in any way to mean that they [Microsoft] don't want to work with us [Authenticlick]." Chin told Leonard that Microsoft still wanted

19

COMPLAINT

Authenticlick to "develop and submit the code" for a custom real-time click scorer and that Microsoft was considering using Authenticlick's code for either an October or January release.

49.    Leonard followed up with Microsoft on October 23, 2007. Chin responded, saying that things were in a "holding pattern" and that Microsoft's "schedules have shifted by roughly 3 months with regards to opportunities for third party scorers."

50.    On March 18, 2008, Leonard followed up with Microsoft again. On this call, Kitts abruptly informed Leonard that Microsoft had "gone ahead with building their [own] scoring interface and are currently using Microsoft's click scoring." Kitts stated that he was still open to and interested in working with Authenticlick—but Kitts and Microsoft had already taken what they needed from Authenticlick.

51.    This was the end of the relationship between Microsoft and Authenticlick. Despite investing significant time and manpower in the potential Microsoft deal for several years, Authenticlick never saw a penny. Authenticlick went out of business several months later.

## V.    AUTHENTICLICK SECURED PATENTS FOR ASPECTS OF ITS CLICK FRAUD TECHNOLOGY

52.    While working with Microsoft to commercialize its click scoring technology, Authenticlick was also pursuing patents to protect its IP and allow for licensing more broadly.

20

53.   On November 13, 2006, Dr. Granville had a call with two Perkins Coie lawyers, Stephen Bishop and Jessica Meyers, about a potential patent application covering Authenticlick's scorer. Meyers followed up the same day asking for additional information about the technology. Over the course of the next few months, Meyers and Bishop worked on a patent application protecting IP related to Internet Explorer (a Microsoft product).

54.   For more than a year, Meyers and Bishop worked extensively on Authenticlick's patent applications. Meyers played a key role, following up on specific patent applications and requesting updates on the technology.

55.   By May, 2007, Perkins Coie had helped Authenticlick file two patent applications protecting its novel and proprietary click scoring system. Authenticlick was taking proactive steps to ensure that it could protect its proprietary intellectual property and broadly license its technology commercially. Those applications later became United States Patent Nos. 10,567,255 ("the '255 Patent") and 8,620,746 ("the '746 Patent").

## VI.   YEARS LATER, BERMAN DISCOVERS MICROSOFT'S CONCEALED MISAPPROPRIATION

56.   After Authenticlick went out of business, co-founder Joel Berman purchased all of Authenticlick's assets—including its intellectual property—and later assigned these assets, and all claims arising out of them, to Chandler Wilkinson LLC.

57.   In 2019-2020, Berman contracted with a third party to investigate potential patent licensing claims. At the time, Berman had no reason to believe that potential patent licensing claims. At the time, Berman had no reason to believe that

Microsoft had directly taken and incorporated Authenticlick's proprietary technology. In 2020, in connection with the results of the third-party licensing investigation, Berman began searching for information about Microsoft's click fraud detection technology. Berman reviewed Microsoft's publicly available information and researched individuals working on click fraud at Microsoft. One of those individuals was Albert Roux.

58.     On August 29, 2020, Berman went to Albert Roux's LinkedIn page and found a link to a paper written by Brendan Kitts in 2013, *The Making of a Large-Scale Online Ad Server*, described above. The paper purported to describe how Kitts and Microsoft solved the click fraud problem.

59.     The article laid out a timeline for the development of Microsoft's technology that *exactly* overlapped with when Microsoft was working with Authenticlick. Kitts boldly claimed that *Microsoft* "had an idea" that might solve the click fraud problem: "having a system score the quality of traffic, and then inform the advertisers what the quality of the traffic was. The advertisers could then load their bids on the different levels of quality." Kitts also claimed that Microsoft "rolled out the new code" in July 2007. As set forth below, the technology Kitts described as having been developed by Microsoft was Authenticlick's approach—which was unique in the industry in 2006-2008.

60.     Kitts stated that he had proposed "to allow third party companies … to supply the click quality engines via our Delivery Engine API, taking the ad network

22

out of the business of assessing click quality . . . " But Kitts noted that this third-party model—which Microsoft represented to Authenticlick as its primary plan—*was at no point ever approved by Microsoft management*.

61. Why would Kitts's team invest such substantial time and energy in a project like third-party scoring that was never approved by its officers? Because it needed Authenticlick's proprietary knowledge and technology to build its own system. Three additional categories of evidence show that Microsoft took Authenticlick's technology:

**A.      Same Timeline**

62. Kitts's claim that Microsoft came up with its own novel solution in 2007—a solution that was, from Kitts's description, nearly identical to Authenticlick's approach—*directly after Authenticlick provided Microsoft with its technology* showed that under the guise of creating a third-party scoring system, Microsoft incorporated Authenticlick's proprietary solutions into its own software ecosystem. On information and belief, this misappropriation started in the very beginning, when Kitts filed a patent application seeking to protect technology similar to Authenticlick's proprietary scorer shortly after Microsoft first discussed Authenticlick's technology with Granville.

63. As mentioned above, on December 6, 2006—almost exactly when Authenticlick sent Microsoft its Technical Proposal—Kitts began drafting a specification he called "Moonshot." That specification identified exactly what

23

Microsoft needed from Authenticlick to integrate an external scorer into its Moonshot search service. Kitts provided the document to Authenticlick in January, 2007, and Authenticlick sent Microsoft its code package to Microsoft—DLL code, test harness, and readme—on March 13, 2007. Upon information and belief, Microsoft then incorporated Authenticlick's proprietary technology into its Moonshot project throughout 2007, supposedly on an evaluation basis in furtherance of a partnership with Authenticlick. As explained above, during this period, Microsoft requested— and Authenticlick provided—extensive technical support, ostensibly only to integrate and run a pilot test program.

64.   Kitts's 2013 paper explained that Microsoft rolled out a "new" click fraud solution in July 2007, exactly *six months* after Microsoft executed a *six-month evaluation agreement with Authenticlick*—and while Microsoft was still stringing Authenticlick along for technical support. Kitts published that he had started working on that technology, which his paper called a "bank shot," earlier in 2007—*precisely* the time during which Authenticlick was sharing its proprietary code and system architecture with Microsoft under the ELA.

**B.   Same Players**

65.   Kitts's 2013 paper revealed further that many Microsoft software engineers purportedly tasked with "evaluating" Authenticlick's code were simultaneously working on Microsoft's "internal" click fraud detection technology.

24

COMPLAINT

66. First, Kitts's 2013 paper claiming credit for developing Authenticlick's technology credited Hank Hoek (Software Development Engineer at Microsoft adCenter) and Julien Beasley (Senior Development Lead for Microsoft adCenter) as contributors to Microsoft's technology. Hoek and Beasley were both heavily involved in troubleshooting and onboarding Authenticlick's technology.

---

**From:** Liz Carrasco [mailto:lcarrasco@authenticlick.net]
**Sent:** Tuesday, March 13, 2007 9:03 AM
**To:** Brendan Kitts
**Cc:** Kaz Igarashi; Hank Hoek; Julien Beasley; Yoni Kahnrose; Scott LeMay; Mitesh Lodaya
**Subject:** Code delivery for Pilot (was RE: Project moonshot, questions about latest specification)

Hi Brendan,

We have enclosed the code for the MoonShot pilot. In addition to the DLL code, there is a test harness and readme included.

After you've had a chance to test this out, let's setup a meeting to review our status & next steps.

Please send any questions you have my way.

Liz

---

67. Further, Hoek, Beasley, and Kaz Igarashi publicly stated that they built real-time invalid click detection software while working at Microsoft. Hoek's LinkedIn page stated that he worked on "Real-Time and offline Click-Fraud Identification" for Microsoft; Beasley's said that he "[d]eveloped click fraud machine learning system that processes all of adCenter traffic," and Igarashi's said that he developed Microsoft's "real-time InvalidClick detection prototype."

68. Finally, a Microsoft slide deck (prepared by Kitts in 2013) explaining the click fraud problem and outlining Microsoft's solution credited *all* of the key

25

COMPLAINT

players involved in bringing Authenticlick's technology to Microsoft as important contributors to *Microsoft's* solution.

69.   Kitts's slide deck highlighted that Rosemond and Handler—two of Authenticlick's points of contact with Microsoft—were doing "business development" and planning for *Microsoft's* internal click fraud product. Similarly, Kitts, Hoek, Beasley, and Igarashi—who iterated with Authenticlick on "integrating" Authenticlick's technology—received credit for "developing" Microsoft's own technology. Of course, Kitts was both the Microsoft point person for coordinating with Authenticlick and the program manager for "developing" Microsoft's technology.

COMPLAINT

## C.  Same Technology

70.  Kitts's description of "Microsoft's" technology mirrors the technology described in Authenticlick's proprietary and confidential Technical Proposal.

71.  Authenticlick's Technical Proposal explained to Microsoft that Authenticlick's technology would provide "a robust score for each click, allowing the client to choose the quality threshold that fits its business model and pricing strategy." But in Kitts's 2013 paper, Kitts claimed that *he* proposed building a program in which "a system score[s] the quality of traffic, and then inform[s] the advertisers what the quality of the traffic was. The advertisers could then load their bids on the different levels of quality." Kitts also said—unambiguously—that in 2007, Microsoft "deployed" a "Click Quality Scoring System package" that "classified the traffic into conversion rate bands and we also loaded bid capabilities into Delivery Engine & were able to control bidding based on quality."

72.  Authenticlick's 2006 Technical Proposal also explained that Authenticlick's proprietary technology used rule sets to assess traffic quality. The Proposal provided several sample rule sets, including—but not limited to—"span test, incentive deductions, blind looks, no invitation, protected identity, category test, excessive clicks, scope test, and bot alarm." The *Data Mining* book chapter explained that "[i]n designing the filtration system, [Microsoft] *intentionally chose a rules representation*. Rules have a number of advantages for large-scale fraud detection," including localizing causes of negative click assessments, enabling identification of

27

COMPLAINT

bad rules, and facilitating troubleshooting and interpretation. *Data Mining* chapter at 184 (emphasis added).

73.    Authenticlick's Technical Proposal disclosed weighting rules and assessing click quality based on the combined output of those weighted rules. Kitts, on behalf of Microsoft, similarly claimed to have developed a method by which rules were weighted and placed into a hierarchy, with winning rules taking priority over other rules that may have also been triggered—allowing for a holistic comparison between rule interactions and enabling assessment of rule relevance.

74.    Authenticlick's Technical Proposal described a system reliant on "data derived from raw server logs." It explained that this approach avoided "the common problems associated with traffic redirects and java script tagging." Kitts—in his 2013 paper—explained that Microsoft developed the same data-extraction approach, to avoid the same problems: "The most obvious way to develop a click scoring system would be to build it as a standard weblog mining system."

75.    Because Authenticlick's technology relied on data derived from raw server logs, Authenticlick's Technical Proposal proposed to implement a "GateKeeper," explained as a "[r]eal time filter for preventing clickstream fraud." But Kitts said that he developed this very approach on Microsoft's behalf. According to Kitts, 2013, Microsoft daringly asked: "why not expose the system to the real thing – the actual HTTP requests as they came in?" In practice, this was not daring at all;

COMPLAINT

Authenticlick had already provided Microsoft with a proprietary blueprint. All Microsoft had to do was integrate the technology into its own software.

## VII. MICROSOFT'S CONDUCT AFTER BERMAN'S DISCOVERY

76. As set forth above, in 2007 and 2008, Microsoft went to great lengths to make Authenticlick believe that the deal didn't work out simply for reasons of timing or matters internal to Microsoft. Authenticlick, and later Berman/Chandler Wilkinson did not discover that Microsoft was using Chandler Wilkinson's trade secrets until Berman chanced upon the Kitts publication on August 29, 2020, as part of an investigation into Microsoft's patent infringement.

77. On September 16, 2020, Chandler Wilkinson—through counsel—alerted Microsoft to "suspected widespread patent infringement by Microsoft of Chandler Wilkinson's patent portfolio and inviting Microsoft to discuss the terms of a potential licensing arrangement." From late 2020 to late 2021, Chandler Wilkinson's counsel corresponded with Matt Walker, a member of Microsoft's in-house legal department. On January 16, 2022, Chandler Wilkinson's counsel sent Microsoft a detailed letter explaining the patent and trade secret issues.

78. Microsoft then re-assigned the case to Jessica Meyers—Authenticlick's patent counsel, who had helped draft *the very patents Chandler Wilkinson was asserting Microsoft had infringed.*

79. Meyers must have known of her *extensive* work representing Authenticlick and its proprietary technology.

COMPLAINT

80.    On March 12, 2022, Meyers sent Chandler Wilkinson's counsel a detailed email explaining Microsoft's view as to why Microsoft's click fraud technology did not infringe the patents Meyers had worked on for Authenticlick. Chandler Wilkinson's counsel raised the egregious and obvious conflict of interest.

81.    Microsoft hired a law firm to conduct an internal review. That review led to a self-serving report on the issue, sent to Chandler Wilkinson on June 1, 2022. The report concluded that Chandler Wilkinson's allegation that Meyers worked for Authenticlick could not be "substantiated." It asserted the straw man argument that Chandler Wilkinson was never a Perkins Coie/Meyers client. That in no way excuses the conflict of Meyers litigating against the very patents she was instrumental in drafting: *Authenticlick* was a Perkins Coie/Meyers client, and Chandler Wilkinson is the successor in interest to Authenticlick.

82.    This self-serving report—addressed to now-Microsoft Chief Legal Officer, Jon Palmer—also claimed that Meyers "was not registered to practice in patent matters until 2009," making it "unlikely that Ms. Meyers could have had substantial involvement or significant client contact" with Authenticlick.

83.    That assertion is obviously incorrect, as evidenced by extensive emails between Meyers and Authenticlick at the time.

COMPLAINT

| From: | VGRANVILLE |
|---|---|
| Sent: | Wednesday, November 29, 2006 4:43 PM |
| To: | vincentg@datashaping.com; jmeyers@perkinscoie.com; sbishop@perkinscoie.com |
| Subject: | RE: Teleconference follow up |
| Attachments: | IE_patch_patent.doc |
| Importance: | High |

Hi Jessica,

█████████████████████████████████████████

█████████████████████████████████████████

Thanks a lot,
~Vincent

84.     Meyers and Granville worked closely together on patent applications for *more than a year*. Meyers was intimately familiar with Authenticlick's technology and played a substantial role in drafting its patent applications. In 2007, Dr. Granville commended her patent drafting as "artfully written" with "deep details to arrive at any questions one might have." Meyers provided a draft score preservation patent to Granville on February 25, 2008, and the two iterated on editing the patent all the way through April. On April 21, Granville commended Meyers: "Your description [of the preservation technique] is accurate and you've perfectly understood [an example] spreadsheet."

85.     Nonetheless, Palmer and Microsoft defended the report's conclusions. But posturing notwithstanding, Microsoft agreed to screen Meyers and others from further work on the case.

86.     Starting on September 19, 2022, the parties tolled the statute of limitations to allow resolution of the underlying claims. The clock resumed on April

31

COMPLAINT

15, 2025. The three-year statute of limitations on Chandler Wilkinson's claims began with Berman's discovery of Kitts's paper on August 29, 2020, making this lawsuit timely if filed on or before March 24, 2026.

87. The facts are clear. Kitts's publication revealed that Microsoft developed its click fraud technology immediately after Authenticlick provided Microsoft with proprietary information under the guise of a business relationship. The paper also showed that Microsoft developed its technology while Authenticlick was still providing Microsoft with extensive technical advice and support. Even further, Kitts's publication credited the same Microsoft engineers who "evaluated" Authenticlick's technology with simultaneously *building* Microsoft's internal system. Unsurprisingly, given these facts, Microsoft's system is strikingly similar to Authenticlick's technology.

## VIII. THE ASSERTED PATENTS

88. Chandler Wilkinson is the assignee of all substantial rights granted in the in-suit patents ("Asserted Patents"), listed below.

89. Chandler Wilkinson is the assignee of all substantial rights granted in United States Patent No. 8,620,746, titled "Scoring Quality of Traffic to Network Sites," a true and correct copy of which is attached as **Exhibit A**.

90. Chandler Wilkinson is the assignee of all substantial rights granted in United States Patent No. 12,284,103 ("the '103 Patent"), titled "Method and System

32

COMPLAINT

For Scoring Quality of Traffic to Network Sites," a true and correct copy of which is attached as **Exhibit B**.

91. Chandler Wilkinson is the assignee of all substantial rights granted in United States Patent No. 11,627,064 ("the '064 Patent"), titled "Method and System For Scoring Quality of Traffic to Network Sites," a true and correct copy of which is attached as **Exhibit C**.

92. Chandler Wilkinson is the assignee of all substantial rights granted in United States Patent No. 11,818,026 ("the '026 Patent"), titled "Method and System For Scoring Quality of Traffic to Network Sites," a true and correct copy of which is attached as **Exhibit D**.

93. Chandler Wilkinson is the assignee of all substantial rights granted in United States Patent No. 12,265,989 ("the '989 Patent"), titled "Preservation of Scores of The Quality of Traffic To Network Sites Across Clients and Over Time," a true and correct copy of which is attached as **Exhibit E**.

94. The patents can be divided into two groups: patents that deal with click scoring ("the click scoring patents"), which are the '746, '064, '026, and '103 Patents, and a patent that deals with click score preservation and standardization ("the preservation patent"), which is the '989 Patent.

95. Chandler Wilkinson owns all rights, title and interest in and to the Asserted Patents, including the right to assert all causes of action under these patents and the right to any remedies for the infringement of these patents.

33

COMPLAINT

## IX.   MICROSOFT'S KNOWLEDGE OF THE ASSERTED PATENTS AND WILLFUL INFRINGEMENT

96.    Microsoft has known of its patent infringement for many years.

97.    First, as explained above, on information and belief, Microsoft's technology was built on the back of Authenticlick's technical advice and support. On July 27, 2006, in one of Authenticlick's first communications with Microsoft, Granville told Handler that Authenticlick was preparing to file a patent on a click scoring system. That, alone, should have put Microsoft on notice regarding Authenticlick's patent-pending technology.

98.    But there's more. As discussed above, one of Kitts's first patent application—filed on behalf of Microsoft, titled "Click-Fraud Protector"—was denied as unpatentable over "Granville 20070192190" in 2011. At that point, Microsoft knew or should have known that its technology was infringing Authenticlick's pending patents.

99.    Also as alleged above, Chandler Wilkinson—through counsel—contacted Microsoft about patent infringement on September 16, 2020. Chandler Wilkinson's counsel sent Microsoft a letter explaining that Microsoft was infringing several Chandler Wilkinson patents, with several more patents pending. This letter notified Microsoft that its technology infringed Authenticlick's click scoring and score-preservation patents.

34

COMPLAINT

100.   Less than a month later, On October 15, 2020, Chandler Wilkinson's counsel sent Microsoft preliminary infringement charts for patents in the click scoring patent family and preservation patent family including the '746 Patent.

101.   To make matters worse, Microsoft assigned Jessica Meyers to investigate Chandler Wilkinson's infringement claims. On information and belief, Meyers must surely have known that Microsoft was infringing Chandler Wilkinson's patents, because she prosecuted many of them beginning in 2006.

102.   Chandler Wilkinson's counsel also gave presentations to Microsoft's counsel on February 10 and June 20, 2023, notifying it of its infringement of additional patents, including the '064 Patent.

## FIRST CAUSE OF ACTION: MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836

103.   Chandler Wilkinson repeats and incorporates by reference each preceding paragraph as if fully set forth here.

104.   Chandler Wilkinson owns trade secrets consisting of Authenticlick's (now Chandler Wilkinson's) confidential and proprietary technology and know-how relating to click fraud. Those trade secrets include the methods for gathering data from web server logs for click fraud prevention; the method for click quality scoring; plural rules-based systems for click assessment; customizable client scoring thresholds; and Authenticlick's DLL code implementing its click scorer. Chandler Wilkinson—and Authenticlick before it—protected these trade secrets through reasonable measures, including access controls, confidentiality agreements, and

COMPLAINT

evaluation protocols as described above. Additionally, when another technology company hired former Authenticlick employees, Berman acted promptly to send notification letters explaining that company's obligation not to use Authenticlick's proprietary IP.

105. The trade secrets derived economic value from not being known or readily ascertainable, and they relate to products or services used in, or intended for use in, interstate commerce, including, for example, Microsoft's ad products.

106. Microsoft used Authenticlick's trade secrets by incorporating them into its own technology without consent, with knowledge that the trade secrets were acquired under circumstances imposing a duty to limit use. The trade secrets were kept secret, as evidenced by the NDA and subsequent ELA between Authenticlick and Microsoft. Microsoft knew the information it received was secret and proprietary, and that it was illegal to use the technology it received from Authenticlick to build its own competing, copycat software.

107. Microsoft used the false and misleading promise of a potentially lucrative business partnership to lure Authenticlick into providing Microsoft with Authenticlick's technology. Microsoft's improper use consisted of, among other things, incorporating Authenticlick's click fraud detection methodology onto its own advertising platforms and using the technical expertise provided in Authenticlick's Technical Proposal, along with Authenticlick's DLL code, to accelerate Microsoft's development of its own click scoring technology.

36

108. Microsoft profited immensely from its use of Authenticlick's technology. As far back as 2013, when Kitts wrote the paper that initially highlighted Microsoft's use of Authenticlick's technology, Microsoft's system was processing "over $2 billion in revenue and ma[de] decisions on every click, impression, and conversion. Microsoft processes over 17% of US search traffic … Every hour the system scores nearly a billion events." After Microsoft's Mark Grote asked Authenticlick to provide pricing for its services to go forward with the business relationship, Authenticlick told Microsoft that it could expect "something in the range of $.005 and $.01 per click."

109. As a direct result of Microsoft's misappropriation, Authenticlick lost significant revenue and was unable to reap the benefits of a licensing relationship that it spent close to two years developing. And as a direct result of Microsoft's misappropriation, Microsoft was unjustly enriched by being able to use and market a sophisticated product (that did not belong to Microsoft) to motivate advertisers to pay to use Microsoft platforms. Microsoft also saved significant time in developing its own products.

**SECOND CAUSE OF ACTION: MISAPPROPRIATION OF TRADE SECRETS UNDER THE CALIFORNIA UNIFORM TRADE SECRETS ACT, CAL. CIV. CODE § 3426**

110. Chandler Wilkinson incorporates by reference all preceding paragraphs as if fully set forth herein.

37

COMPLAINT

111.   Chandler Wilkinson owns trade secrets within the meaning of Cal. Civ. Code § 3426.1(d). Those trade secrets are the same as described in Count One. The trade secrets derived economic value from not being known or readily ascertainable.

112.   Microsoft used and/or disclosed Authenticlick's trade secrets without consent, and it did so with knowledge that the information was acquired under circumstances imposing a duty to limit use. The trade secrets were kept secret, including as evidenced by the NDA and subsequent ELA between Authenticlick and Microsoft. They were only disclosed with rigid protections guarding against further disclosure. Microsoft knew the information it received was secret and proprietary, and Microsoft knew or should have known that it was illegal to use the technology.

113.   Microsoft's improper use consisted of, among other things, incorporating Authenticlick's click fraud detection methodology onto its own advertising platforms. This constitutes misappropriation under Cal. Civ. Code § 3426.1(b).

114.   As a direct result of Microsoft's misappropriation, Authenticlick lost revenue and was unable to reap the benefits of a licensing relationship that it spent close to two years developing. And as a direct result of Microsoft's misappropriation, Microsoft was unjustly enriched by saving significant time to develop its own products, and by being able to market a product that did not belong to Microsoft.

COMPLAINT

**THIRD CAUSE OF ACTION: INFRINGEMENT OF U.S. PATENT NO. 8,620,746**

115. Chandler Wilkinson repeats and incorporates by reference each preceding paragraph as if fully set forth herein and further states:

116. On December 31, 2013, the United States Patent and Trademark Office duly and legally issued the '746 Patent entitled "Scoring Quality of Traffic to Network Sites."

117. On May 31, 2007, Dr. Granville, the inventor of the '746 Patent, assigned all title, rights, and interest in and to U.S. Patent Application No. 11/756,568 to Authenticlick, Inc. The assignment was recorded with the United States Patent and Trademark Office on October 17, 2007.

118. On October 9, 2007, Dr. Granville again assigned all title, rights, and interest in and to U.S. Patent Application No. 11/756,568 to Authenticlick, Inc. The assignment was recorded with the United States Patent and Trademark Office on November 26, 2007.

119. On September 16, 2008, Authenticlick assigned all title, rights, and interest in and to U.S. Patent Application No. 11/756,568 to Joel Berman. The assignment was recorded with the United States Patent and Trademark Office on October 16, 2008.

120. On July 5, 2013, Berman assigned all title, rights, and interest in and to U.S. Patent Application No. 11/756,568 to Elan Branch, LLC. The assignment was recorded with the United States Patent and Trademark Office on July 8, 2013.

39

COMPLAINT

121.    On December 23, 2015, Elan Branch, LLC assigned all title, rights, and interest in and to U.S. Patent Application No. 11/756,568 to Joel Berman. The assignment was recorded with the United States Patent and Trademark Office on June 24, 2016.

122.    On September 15, 2020, Berman assigned all title, rights, and interest in and to U.S. Patent Application No. 11/756,568 to Chandler Wilkinson LLC. The assignment was recorded with the United States Patent and Trademark Office on September 18, 2020.

123.    Chandler Wilkinson is the owner of all rights, title, and interest in and to the '746 Patent, including the right to assert all causes of action arising under the '746 Patent and the right to any remedies for the past, current, and future infringement of the '746 Patent.

124.    Microsoft is not licensed under the '746 Patent, either expressly or implicitly, nor does it enjoy or benefit from any rights in or to the '746 Patent whatsoever.

125.    Claim 1 illustrates the claims of the '746 Patent. It claims:

A method of characterizing the quality of traffic received by a first network site based on multiple agent actions, the method comprising:

generating, by a computer, a global rule set comprising a plurality of rules, wherein each of the plurality of rules comprises an expression for evaluating one or more parameters associated with an agent session;

selecting, by the computer, a traffic data set representative of traffic at a second network site, wherein the traffic at the second network site comprises similar characteristics as traffic of the first network site;

40

COMPLAINT

obtaining supplemental external data from an advertiser for determining whether the agent session results in a desired agent action;

enhancing the traffic data set using the Supplemental external data to obtain an enhanced traffic data set identifying a plurality of agent sessions resulting in the desired agent action;

analyzing, by the computer, the global rule set based on the enhanced traffic data set to generate an environment rule set for characterizing interactions with the first network site;

selecting, by the computer, a plurality of actions that the agent may take during an interaction with the first network site, wherein each of the plurality of actions may result in the desired agent action;

evaluating, by the computer, whether two or more of the plurality of actions occurred during the agents interaction with the first network site; and

using, by the computer, the environment rule set to characterize the quality of the agents interaction with the first network site based on whether the two or more of the plurality of actions occurred during the agents interaction with the first network site, wherein the quality of the agents interaction having the two or more of the plurality of actions is characterized as more valuable than an agents interaction having only one action;

classifying, by the computer, as statistically significant one or more agent interactions with the first network site that have been demonstrated to be meaningful indicators of traffic that is valuable to the first network site;

classifying, by the computer, as not statistically significant one or more agent interactions with the first network site that have not been demonstrated to be meaningful indicators of traffic that is valuable to the first network site;

applying, by the computer, a first algorithm to the one or more agent interactions classified as statistically significant, applying, by the computer, a second algorithm to the one or more agent interactions classified as not statistically significant;

using, by the computer, the environment rule set to characterize the quality of the traffic received by the first network site based on the application of the first and second algorithms;

41

calculating a first non-binary score for the one or more agent interactions classified as statistically significant, wherein the first non-binary score is calculated based on the result generated by applying the first algorithm; and

calculating a second non-binary score for the one or more agent interactions classified as not statistically significant, wherein the second non-binary score is calculated based on the result generated by applying the second algorithm; and

evaluating a plurality of non-binary score results for both the agent interactions that are statistically significant and that are not statistically significant to determine which combinations of parameters are predictors of a desired quality of agent interactions with the first network site; and

generating a session non-binary score for one or more agent interaction sessions based on the combinations of parameters associated with the one or more sessions that were determined to be predictors of the desired quality of agent interaction with the first network site.

126.  Microsoft's click assessment technology has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including at least claim 1 of the '746 Patent in violation of 35 U.S.C. § 271(a) because Microsoft makes, uses, offers for sale, and relies upon, including in this district, technology that performs the above method, including all Microsoft products that use Microsoft Advertising.

127.  First, and solely by way of example, Microsoft generates by computer a global rule set comprising a plurality of rules that comprise an expression for evaluating agent sessions. Microsoft publicly states that it "employs techniques based on identifiers, activity and patterns found in web log data." *See* Microsoft Advertising, *Microsoft Advertising click measurement: Description of methodology*,

COMPLAINT

https://help.ads.microsoft.com/#apex/ads/en/60220/0 (last accessed February 27, 2026). Those techniques are rules-based processing tools for evaluating agent sessions. The list of rules employed by Microsoft includes, but is not limited to, assessing the number of clicks per impression; user frequency rates; impression staleness; impression-click refractory period; repeat-click refractory period; click activity indicative of low value; served ad location; protocol validation; upfront filtration (or blacklists); and data integrity tools.

128. Microsoft states that it uses "activity-based rules, machine learning, and the results of human investigations" to detect sophisticated invalid traffic. *Id.*

129. And the *Data Mining* chapter written by Kitts and other Microsoft engineers states that "[i]n designing the filtration system, [Microsoft] *intentionally chose a rules representation.* Rules have a number of advantages for large-scale fraud detection," including localizing causes of negative click assessments, enabling identification of bad rules, and facilitating troubleshooting and interpretation. *Data Mining* chapter at 184–185 (emphasis added).

130. Microsoft compares data across network sites to update rule accuracy, when network sites are similar. Microsoft explains that its rules are "Activity-Based," which it explains to mean that "Microsoft Advertising uses machine learning systems to predict the quality of traffic and determine commercial intent. Microsoft Advertising invalidates traffic that fails to meet a minimum level of quality as assessed through these techniques." Microsoft Advertising, *Microsoft Advertising*

43

COMPLAINT

*click measurement: Description of methodology*, https://help.ads.microsoft.com/#apex/ads/en/60220/0 (last accessed February 27, 2026). On information and belief, this means that Microsoft assesses click quality in one environment to extrapolate its findings to other environments.

131. The *Data Mining* chapter also explains that Microsoft aggregates data from across network sites: "often an effective rule can be developed that looks for activity from an attribute of interest such as an IP. Similar rules can often be developed which look for the same kind of unusual behavior coming a different levels of aggregation from other attributes – such as publisher, advertiser and so on. We call these key families." *Data Mining* chapter at 190.

132. Microsoft Advertising obtains supplemental external data from advertisers to determine whether traffic results in a desired action, further reinforcing its click assessment framework. Microsoft allows advertisers to opt into using ClickIDs, which automatically logs clicks on an advertiser's advertisement through redirection to the Microsoft Advertising server, allowing generation of additional data regarding the agent's action. Microsoft Advertising, *Microsoft Advertising click measurement: Description of methodology*, https://help.ads.microsoft.com/#apex/ads/en/60220/0 (last accessed February 27, 2026).

133. Microsoft also provides a service called "Universal Event Tracking", or UET. Advertisers opt into the service; Microsoft explains that "Once the UET tag is

COMPLAINT

installed by the advertiser across their website, the tag reports user activity on the advertiser website to Microsoft Advertising. Advertisers can then create conversion goals to specify which subset of user actions on the website qualify to be counted as conversions. If Microsoft Advertising finds a match between a conversion goal and the user activity logged by the UET tag installed on their website, it counts a conversion." Microsoft Advertising, *FAQ: Universal Event Tracking,* https://help.ads.microsoft.com/apex/index/3/en/53056/ (last accessed February 27, 2026).

134. Microsoft uses its global rule set to generate a context-specific rule set characterizing interactions with a network site. On information and belief, it uses a combination of its global rule set and its UET framework to characterize traffic quality as applied to different network sites. This includes the long list of assessed actions, detailed above.

135. Microsoft uses two or more of those rules to characterize web traffic on a network site. On information and belief, each rule is used to evaluate the quality of traffic; meaning that if more rules are triggered, the agent action is characterized as more valuable than if fewer rules are triggered.

136. Microsoft uses UET and other conversion-tracking metrics to determine a statistically significant set of agent interactions with a network site that indicate valuable traffic to the network site. Microsoft explicitly allows users to "specify which subset of user actions on the website qualify to be counted as conversions,"

COMPLAINT

and tracks the correlation between those conversion goals and the user activity "logged by the UET tag installed on [the advertiser's] website." Microsoft Advertising, *FAQ: Universal Event Tracking*, https://help.ads.microsoft.com/apex/index/3/en/53056/ (last accessed February 27, 2026). It does the same thing for low-value traffic, again based on the advertiser's conversion goal.

137. The *Data Mining* book chapter also explains that Microsoft applies different rule sets to data that it identifies as statistically significant versus data that it identifies as statistically insignificant; this allows it to gather data from even small samples that would otherwise be unhelpful:

> The basic approach for handling these IPs is to create a family of versions of a rule but at different scale. For example, say that we have a rule BOT1 which is working very well to identify traffic with less than 20 clicks. We can create another version of this rule that works at 200 clicks, 2000 clicks, and 20,000 clicks. At these levels of scale the anomaly or signature that is being detected is usually much more subtle and so it doesn't need to register comparatively very high, however with the large number of clicks it is statistically significant. The end result is a family of rules eg. BOT1-A..BOT1-E that are designed to operate at different levels of scale, and which naturally handle proxy IPs as well as other large sources of traffic.
> The "scale family" is a discretized version of a significance test which takes into account the number of observations when determining whether a variable is statistically significant / significantly different from the norm.

138. Microsoft also uses those agent interactions to create non-binary scores. It employs techniques based on "identifiers," assigning scores reflecting the likelihood that traffic will be high quality.

COMPLAINT

> **General and sophisticated invalid traffic filtration methodology**
>
> To identify and filter (exclude) invalid click activity—including, but not limited to, non-human click activity and suspected click fraud—Microsoft employs techniques based on identifiers, activity and patterns found in web log data. Microsoft Advertising receives sufficient signals to apply a 100% invalid traffic decision rates on click activity including traffic from both Microsoft and partner properties. However, because user identification and intent cannot always be known or discerned by publishers, advertisers or their respective agents, it is unlikely that all invalid click activity can be identified and excluded from the reported results. Microsoft Advertising engineering will apply updates to the filtration methods below on an as needed basis.

Source: Microsoft Advertising, *Microsoft Advertising click measurement: Description of methodology*, https://help.ads.microsoft.com/#apex/ads/en/60220/0 (last accessed December 9, 2025).

139. The Microsoft Advertising support page tells paying advertisers that Microsoft Advertising automatically categorizes clicks into pre-determined categories, using those non-binary scores:

> **Monitoring clicks: Telling the good from the bad**
>
> Each time your ad is clicked, Microsoft Advertising categorizes the click as either a *standard-quality click*, a *low-quality click*, or an *invalid click*.
>
> Standard-quality clicks are clicks that are most likely from potential customers. These are the clicks that have the best potential to drive customer awareness of your business and boost your conversion rate. On the other hand, low-quality and invalid clicks typically don't result in conversions or value to your business. These types of click often originate from spiders, robots, questionable sources, or test servers.

140. Those outputs indicate the quality of clicks on advertisements hosted on Microsoft platforms.

> **Click quality definitions**
> - **Defective clicks:** Clicks that have technical problems or defects that prevent them from being billable, but otherwise might reflect actual human activity. All defective clicks are non-billable.
> - **Invalid clicks:** Clicks that fail to meet the minimum requirements outlined in the IAB Click Measurement Guidelines. Invalid clicks are a subset of low-quality clicks.
> - **Low-quality clicks:** Clicks that Microsoft Advertising classifies as non-billable. Low-quality clicks originate from a variety of sources, including:
>   - Clicks that suggest low commercial intent.
>   - Clicks that have been identified as likely coming from automated bots.
>   - Clicks that display unusual or suspicious patterns of behavior.

Source:   Microsoft Advertising, *Microsoft Advertising click measurement: Description of methodology*, https://help.ads.microsoft.com/#apex/ads/en/60220/0 (last accessed December 9, 2025).

141.   Beyond these broad categories of click quality, Microsoft's data collection and analysis allows advertisers to view enhanced click quality. Advertisers can customize reports to display low-quality clicks, low-quality clicks sophisticated, low-quality impressions, and low-quality click conversions (among other sub-categories). Microsoft Advertising, *Microsoft Advertising click measurement: Description of methodology*, https://help.ads.microsoft.com/#apex/ads/en/60220/0 (last accessed December 9, 2025). Microsoft explains that this feature allows advertisers to "quantify the percentage of low-quality clicks that are being removed by Microsoft Advertising" and "compare low-quality click removal." *Id.*

142.   Microsoft does the same thing based on agent interactions classified as non-statistically significant. As explained above, Microsoft applies different rule sets to non-statistically significant data samples to create meaningful results.

143.   Based on these scores, Microsoft uses machine learning techniques to determine which combinations of rules accurately predict a desired quality of agent interactions with network sites. Microsoft explains that it uses machine learning systems to update its assessment framework and explains that "[a]ll assessments of traffic are probabilistic in nature and are based on predictive algorithms. Such categorizations and assessments are the best Microsoft Advertising estimates of traffic quality." Microsoft Advertising, *Microsoft Advertising click measurement:*

48

COMPLAINT

*Description of methodology*, https://help.ads.microsoft.com/#apex/ads/en/60220/0 (last accessed February 27, 2026) (emphasis added).

144. Microsoft uses these rules to determine whether clicks are likely to result in desired traffic to a network site; on that basis, it categorizes traffic into different bands: defective, invalid, low-quality, and high-quality, among others.

145. Microsoft allows advertisers to receive customized reports explaining click quality on their advertisements, highlighting that Microsoft uses collected data to generate a click quality score:

## Data reporting

### Click quality reports for Microsoft Advertising advertisers

The account performance and campaign performance reports available on the Reports tab of Microsoft Advertising can be enhanced to view click quality information. For more information, see the topic in Microsoft Advertising Help. Several columns related to click quality may be added to this report:

- Low-quality clicks
- Low quality clicks general
- Low quality clicks sophisticated
- Low-quality impressions
- Low-quality click rate
- Low-quality impression rate
- Low-quality click conversions
- Low-quality click conversion rate

The columns allow you to:

- Quantify the percentage of low-quality clicks that are being removed by Microsoft Advertising.
- Compare low-quality click removal in Search ads programs.
- View impressions filtering.
- Report conversions that result from low-quality clicks: Microsoft Advertising reports conversions that result from clicks that were removed because of the aggressive Microsoft Advertising filtration program.

Source: Microsoft Advertising, *Microsoft Advertising click measurement: Description of methodology*, https://help.ads.microsoft.com/#apex/ads/en/60220/0 (last accessed December 9, 2025).

146. Microsoft touts this technology as safeguarding advertisers' investment in advertising on Microsoft's platform. For instance, the Microsoft Traffic Quality Center explains that "Microsoft is committed to delivering world-class service to advertisers and publisher partners" and that "Microsoft Advertising uses real-time and post-click systems to help guard against low quality and invalid clicks." Microsoft Advertising, *Traffic Quality Center,* https://help.ads.microsoft.com/#apex/ads/en/60223/-1 (last accessed December 9, 2025).

147. Microsoft also explains to advertisers that its click monitoring technology can be incorporated into "hosted creatives such as JPGs, GIFs, and PNGS…" This allows Microsoft to integrate creative advertising into its own platforms using technology claimed by the '746 Patent. Microsoft Learn, *Microsoft Invest – Click Tracking,* https://learn.microsoft.com/en-us/xandr/invest/click-tracking (last accessed December 9, 2025).

148. The same technology underlies LinkedIn ads, which Microsoft owns. See Microsoft, *Microsoft Buys LinkedIn,* https://news.microsoft.com/announcement/microsoft-buys-linkedin/ (last accessed December 9, 2025). LinkedIn operates a service called Campaign Manager, which is the "advertising platform on LinkedIn." Campaign Manager allows advertisers to view charts explaining how much they spent on advertising; how many impressions their ads received; how many clicks their ads received; and follow-on calculations

50

based on those numbers, including click-through rate and average cost per click. *See*
LinkedIn Advertise, *Analyze your campaign performance*,
https://business.linkedin.com/advertise/ads/best-practices/analyze-your-
performance (last accessed December 9, 2025). All of those numbers are based on
the foundational premise that clicks and impressions are done by humans, and
LinkedIn—that is, Microsoft—uses the '746 Patent's methodology to do that.

149.    As detailed above, Microsoft Advertising infrastructure infringes at
least Claim 1 of the '746 Patent. Microsoft's acts of infringement have caused and
continue to cause damage to Chandler Wilkinson, and Chandler Wilkinson is entitled
to recover from Microsoft the damages it has sustained as a result of these wrongful
acts in an amount subject to proof at trial, but in no event less than a reasonable
royalty, lost profits, and/or a lump sum through the expiration date of the '746 Patent,
for the use made of the invention described and claimed in the '746 Patent, together
with interest and costs as fixed by the Court.

150.    Microsoft has undertaken these acts of infringement despite knowing
that such actions infringe at least claim 1 of the '746 Patent. Accordingly, Microsoft
has willfully infringed and continues to willfully infringe at least claim 1 of the '746
Patent.

151.    To the extent applicable, Plaintiff has complied with 35 U.S.C. § 287(a)
with respect to the '746 Patent. Further, Microsoft has been on notice of the '746

COMPLAINT

Patent and its infringement since at least September 16, 2020, when Chandler Wilkinson's counsel notified Microsoft of its infringement.

## FOURTH CAUSE OF ACTION: INFRINGEMENT OF U.S. PATENT NO. 11,627,064

152. Chandler Wilkinson repeats and incorporates by reference each preceding paragraph as if fully set forth herein and further states:

153. On April 11, 2023, the United States Patent and Trademark Office duly and legally issued the '064 Patent entitled "Method and System for Scoring Quality of Traffic to Network Sites."

154. On January 5, 2022, Vincent Granville assigned all title, rights, and interest in and to U.S. Patent Application No. 17/483,526 to Chandler Wilkinson LLC. The assignment was recorded with the United States Patent and Trademark Office on January 10, 2022.

155. Chandler Wilkinson is the owner of all rights, title, and interest in and to the '064 Patent, including the right to assert all causes of action arising under the '064 Patent and the right to any remedies for the past, current, and future infringement of the '064 Patent.

156. Microsoft is not licensed under the '064 Patent, either expressly or implicitly, nor does it enjoy or benefit from any rights in or to the '064 Patent whatsoever.

157. Microsoft has infringed and continues to directly infringe at least claim 1 of the '064 Patent in violation of 35 U.S.C. § 271(a), either literally or through the

doctrine of equivalents, by making, using, selling, or offering for sale in the United States systems and methods that practice claims of the '064 Patent, including the Microsoft Advertising system.

158. Claim 1 illustrates the claims of the '064 Patent. It claims:

A computer-implemented method comprising:

identifying, by a computer system comprising one or more hardware processors, agent actions in a server log obtained from at least one of a publisher, an advertiser, or a third party, wherein the agent actions correspond to actions performed by a plurality of agents interacting with content presented on a network site, wherein the agent actions are associated with a set of network parameters, and wherein each agent action of the agent actions is associated with a combined identifier that includes: (i) an agent identifier of an agent that performed the agent action; and (ii) two or more parts of a domain name associated with the agent identifier;

accessing, by the computer system, a set of traffic rules from a data store, wherein each traffic rule of the set of traffic rules correlates with a likelihood that at least one network parameter of each of the agent actions indicates a desired agent action that generates value for the at least one of the publisher, the advertiser, or the third party;

applying, by the computer system, the set of traffic rules to the agent actions to generate non-binary scores for the agent actions, wherein applying the set of traffic rules includes, for each combined identifier:

measuring a velocity metric between at least two consecutive agent actions associated with the combined identifier; and

determining an elapsed time during which the agent associated with the combined identifier interacted with the content of the network site;

normalizing, by the computer system, the non-binary scores into a standard range, wherein a first portion of the standard range corresponds to agent actions having a first relative value, a second portion of the standard range corresponds to agent actions having a second relative value, and a third portion of the standard range corresponds to agent actions having a third relative value;

COMPLAINT

generating, based on the normalized non-binary scores and by the computer system, an output identifying that a set of agent actions correspond to low quality interactions with the content presented on the network site; and

causing, based on the output and by the computer system, the content to be removed from one or more web pages of the network site that are associated with the set of agent actions.

159. By way of example, to score clicks, Microsoft first identifies a set of agent interactions in a server logs. In fact, Microsoft brags that "100% of ad request and click transactions are logged."

> Web server logs
> - 100% of ad request and click transactions are logged. In some cases, an ad impression is relayed to Microsoft Advertising through a syndicated network, and Microsoft Advertising treats this as an impression.
> - The MB Base Ad call web server log, created by Microsoft Advertising, captures information that is generated by the delivery engine as it receives the ad call and then formulates an ad response.
> - The MR Click web server log contains information that is collected during a click.
> - The FR Fraud web server log records click events that are found to be defective for one reason or another, including encryption checksum failures.

Source:     Microsoft Advertising, *Microsoft Advertising click measurement: Description of methodology*, https://help.ads.microsoft.com/#apex/ads/en/60220/0 (last accessed December 9, 2025).

160. This logged data is the basis for Microsoft's "invalid click activity" technology:

> **General and Sophisticated Invalid Traffic Filtration Methodology**
>
> To identify and filter (exclude) invalid click activity—including, but not limited to, non-human click activity and suspected click fraud—Microsoft employs techniques based on identifiers, activity and patterns found in web log data. Microsoft Advertising receives sufficient signals to apply a 100% invalid traffic decision rates on click activity including traffic from both Microsoft and partner properties. However, because user identification and intent cannot always be known or discerned by publishers, advertisers or their respective agents, it is unlikely that all invalid click activity can be identified and excluded from the reported results. Microsoft Advertising engineering will apply updates to the filtration methods below on an as needed basis.

54

COMPLAINT

Source:    Microsoft Advertising, *Microsoft Advertising click measurement: Description of methodology*, https://help.ads.microsoft.com/#apex/ads/en/60220/0 (last accessed December 9, 2025).

161.   Microsoft collects a wide variety of data from web logs. It explains that its fraud-prevention technology is based on assessing both impressions (user views) and advertisement clicks—and several sub-categories of each. For instance, Microsoft collects both search ad impressions and content ad impressions:

### Click measurement methodology

Microsoft Advertising bases its click-measurement methodology on the terms and descriptions described in this section.

**The Microsoft Advertising click-referral cycle**

*Impression*

Preceding a click by a user is an originating event, called an ad impression, in which content and ads are first served to the user. An ad impression can be served to the user in either of two ways:

- Search ad impression: Any Search ad served on the Microsoft Advertising Network. This includes Bing.com (and sites owned and operated by Bing, such as Bing.de and Bing.co.uk) and .com (including other sites owned and operated by Yahoo! Inc.). The Microsoft Advertising Network also includes websites owned and operated by Microsoft's and Yahoo! Inc.'s syndicated search partners.
- Content ad impression: A user requests a website by directly typing the site URL or by clicking a link. The Microsoft Advertising delivery engine then serves an ad to the user, along with the requested webpage and content, to publishers participating in the content network. The content network includes Bing-owned-and-operated sites, and Yahoo! Inc.-owned-and-operated sites and syndicated partner sites.

Source:    Microsoft Advertising, *Microsoft Advertising click measurement: Description of methodology*, https://help.ads.microsoft.com/#apex/ads/en/60220/0 (last accessed December 9, 2025).

162.   Microsoft also associates agent actions with a combined identifier that includes a unique agent identifier and two or more parts of a domain name. First, Microsoft uses a tool called "Microsoft User Identifier" (MUID) to identify the user behind any given click.

> Additional elements of measurement methodology
> *Cookies*
>
> Microsoft Advertising uses the Microsoft User Identifier (MUID) to help count valid clicks.

Source:    Microsoft Advertising, *Microsoft Advertising click measurement: Description of methodology*, https://help.ads.microsoft.com/#apex/ads/en/60220/0 (last accessed December 9, 2025).

163.    Microsoft also employs technology allowing it to collect data about agent interactions even after the agent leaves the Microsoft website. When an agent clicks on an advertisement, the agent is brought to the advertiser's webpage. That triggers data collection through a Microsoft's UET framework:

> ## FAQ: Universal Event Tracking
>
> Universal Event Tracking (UET) is a useful way to track what happens after someone has clicked on your ad. Here, find some common user questions, tips, and best practices when getting started with UET:
>
> ⌄ What is UET and how does it related to conversion tracking and remarketing features?
> Universal Event Tracking (UET) is a mechanism for advertisers to report user activity on their websites to Microsoft Advertising by installing one site-wide tag. UET is a prerequisite for advertisers to track conversions and/or do remarketing. Once the UET tag is installed by the advertiser across their website, the tag reports user activity on the advertiser website to Microsoft Advertising. Advertisers can then create conversion goals to specify which subset of user actions on the website qualify to be counted as conversions. If Microsoft Advertising finds a match between a conversion goal and the user activity logged by the UET tag installed on their website, it counts a conversion. Similarly, advertisers can create remarketing lists based on user activity on website and Microsoft Advertising matches the list definitions with UET logged user activity to put users into those lists.

Source:    Microsoft Advertising, *FAQ: Universal Event Tracking*, https://help.ads.microsoft.com/apex/index/3/en/53056/ (last accessed December 9, 2025).

164.    Microsoft uses special technology to identify the "agent that performed the agent action." When a Microsoft advertising platform displays an advertisement to a customer, that advertisement includes a special encrypted link with a unique request ID (RGUID). The RGUID is then extracted from the click request, allowing

56

Microsoft to "join the click and the impression, and all of the information present at the time of the impression…" In other words, Microsoft's RGUID technology allows it to consolidate information about a single agent that performed the agent action.

> Encrypted links
> - Microsoft Advertising employs an encrypted-link technique to link the impression to the click and recover the original context of the ad call. When Microsoft Advertising receives an ad call and then prepares the ad to serve back, it embeds a special RGUID (Request GUID) identifier in the encrypted link. The link is sent out with the ad text and appears on the publisher page.
> - By embedding the RGUID in an encrypted link and then extracting it from the click request, Microsoft Advertising can join the click and the impression, and all of the information present at the time of the impression can be made available to the click.
> - The link encryption prevents tampering with the RGUID and link contents, ensuring that filtration based on link click (that is, one click per impression) can be enforced reliably.

Source:    Microsoft Advertising, *Microsoft Advertising click measurement: Description of methodology*, https://help.ads.microsoft.com/#apex/ads/en/60220/0 (last accessed December 9, 2025).

165. Microsoft's UET software allows Microsoft to associate still more data with the "agent identifier of [the] agent that performed the agent action." Microsoft's FAQ website lists 27 categories of automatically-collected data, with ten other optional types available if the advertiser enables "UET Insights." Again, all of this is linked to a unique agent ID.

> ∨ What data does UET collect once I install it on my website?
> UET collects the following data and Microsoft Advertising retains it for 390 days. UET will also collect the IP address and the Microsoft cookie (with an expiration date of 13 months). This cookie contains a GUID assigned to the user's browser, and/or an ID assigned to a user as long as it authenticated through their Microsoft account. In general, the cookie in the relevant domain and IP address are always passed with every http request and not just via UET. Microsoft Advertising doesn't resell this data to third parties or share it with other advertisers.

Source:    Microsoft    Advertising,    *FAQ: Universal Event Tracking*, https://help.ads.microsoft.com/apex/index/3/en/53056/ (last accessed December 9, 2025).

COMPLAINT

166.   Microsoft also collects two or more components of the domain name associated with an agent identifier. Its RGUID tool sends a link out with the advertisement's text, and then extracts the RGUID from the click request, allowing it to join "the click and the impression, and all of the information present at the time of the impression can be made available to the click."

Encrypted links

- Microsoft Advertising employs an encrypted-link technique to link the impression to the click and recover the original context of the ad call. When Microsoft Advertising receives an ad call and then prepares the ad to serve back, it embeds a special RGUID (Request GUID) identifier in the encrypted link. The link is sent out with the ad text and appears on the publisher page.

- By embedding the RGUID in an encrypted link and then extracting it from the click request, Microsoft Advertising can join the click and the impression, and all of the information present at the time of the impression can be made available to the click.

- The link encryption prevents tampering with the RGUID and link contents, ensuring that filtration based on link click (that is, one click per impression) can be enforced reliably.

Source:   Microsoft Advertising, *Microsoft Advertising click measurement: Description of methodology*, https://help.ads.microsoft.com/#apex/ads/en/60220/0 (last accessed December 9, 2025).

167.   As explained above, Microsoft retains a bank of traffic scoring rules that it applies to data collected from web logs.

General and sophisticated invalid traffic filtration methodology

To identify and filter (exclude) invalid click activity—including, but not limited to, non-human click activity and suspected click fraud—Microsoft employs techniques based on identifiers, activity and patterns found in web log data. Microsoft Advertising receives sufficient signals to apply a 100% invalid traffic decision rates on click activity including traffic from both Microsoft and partner properties. However, because user identification and intent cannot always be known or discerned by publishers, advertisers or their respective agents, it is unlikely that all invalid click activity can be identified and excluded from the reported results. Microsoft Advertising engineering will apply updates to the filtration methods below on an as needed basis.

Source:   Microsoft Advertising, *Microsoft Advertising click measurement: Description of methodology*, https://help.ads.microsoft.com/#apex/ads/en/60220/0 (last accessed December 9, 2025).

COMPLAINT

168.   Several of the rules used to assess the quality of the traffic—therefore, determining whether an ad should be placed before an agent—include elapsed time and velocity metrics.

i.      Time between clicks:

**Multiple-click-per-impression**
Microsoft Advertising uses the "multiple-click-per-impression method" in which a click is discarded when the time between the click and the previous click on an ad impression or search-result content is less than the repeat-click-refractory period specified by Microsoft. This rule is meant to correct for navigational mistakes such as unintentional double-clicking on an impression.

**Repeat-click refractory period**
Rapid repeat-clicks can also signify robotic or non-commercial intent behavior. For a second click to be considered billable, a refractory period—that is, a minimum delay between repeated ad clicks—must be met.

ii.     Click velocity:

**Impression staleness**
A click is considered invalid if the time between the ad impression (or search result) and the click is more than the impression-staleness window. For example, if a user clicks an ad outside the impression-staleness window, Microsoft Advertising considers the click "out of context" and invalid.

**Impression-click refractory period**
The click will be filtered as invalid if the time between the ad impression (or search result) and the click is less than a minimum amount called the impression-click refractory window.

Source:   Microsoft Advertising, *Microsoft Advertising click measurement: Description of methodology*, https://help.ads.microsoft.com/#apex/ads/en/60220/0 (last accessed December 9, 2025).

169.   Microsoft's Universal Event Tracking feature similarly collects data including "page latencies" which represents the time a user spends on a page, impacting a click score.

**Improved advertising performance**

Not only do UET Insights offer a deeper understanding of your website's performance, they also enable Microsoft Advertising to optimize your ad performance more effectively via improved targeting, fraud detection, and reduced conversion loss. The additional signals include page latencies (speed and load times), click and scroll interactions, purchase cart details, cart abandonment details, browser-based signals, and JavaScript browser errors.

Source:   Microsoft Advertising, *Introducing new website insights for Universal Event Tracking Tag*, https://about.ads.microsoft.com/en/blog/post/july-2023/introducing-new-website-insights-for-universal-event-tracking-tag   (last accessed December 10, 2025).

170. As explained above, Microsoft normalizes the score results into a standard range, where certain scores represent invalid clicks (a "subset of low-quality clicks"); low-quality clicks, and high-quality clicks. This reflects the clicks' "relative value." The categorization is documented in an "output" identifying "low quality interactions with the content presented on the network site."

171. Finally, Microsoft uses these click quality assessments to remove ads from webpages where the traffic is unlikely to be high-quality. It does this in at least two ways. First, Microsoft declines to credit clicks that are flagged as robotic or fraudulent by its "internal house filter lists," which is a collection of user agents that Microsoft has pre-determined to be low-value. Microsoft does the same thing using "external filter lists," too. Second, Microsoft does not show advertisements to agents that are unlikely to generate conversions through its "audience advertising" program, which assesses the audience for the advertisement to ensure that advertisements are only shown to a high-quality audience.

172. Microsoft's acts of infringement have caused and continue to cause damage to Chandler Wilkinson, and Chandler Wilkinson is entitled to recover from

Microsoft the damages sustained as a result of Microsoft's wrongful acts in an amount subject to proof at trial. In any event, such recovery should be no less than a reasonable royalty, lost profits, and/or a lump sum through the expiration date of the '064 Patent, for the use made of the invention claimed in the '064 Patent, together with interest and costs as fixed by the Court.

173.    Microsoft has undertaken these acts of infringement despite knowing that such actions infringe at least claim 1 of the '064 Patent. Accordingly, Microsoft has willfully infringed and continues to willfully infringe at least claim 1 of the '064 Patent.

174.    To the extent applicable, Plaintiff has complied with 35 U.S.C. § 287(a) with respect to the '064 Patent. Further, Microsoft has been on notice of the '064 Patent and its infringement since at least June 20, 2023, when Chandler Wilkinson's counsel notified Microsoft of its infringement.

### FIFTH CAUSE OF ACTION: INFRINGEMENT OF U.S. PATENT NO. 11,818,026

175.    Chandler Wilkinson repeats and incorporates by reference each preceding paragraph as if fully set forth herein and further states:

176.    On November 14, 2023, the United States Patent and Trademark Office duly and legally issued the '026 Patent entitled "Method and System for Scoring Quality of Traffic to Network Sites."

177.    On September 15, 2020, Joel Berman assigned all title, rights, and interest in and to U.S. Patent Application No. 18/115,472 to Chandler Wilkinson

61

COMPLAINT

LLC. The assignment was recorded with the United States Patent and Trademark Office on February 28, 2023.

178. Chandler Wilkinson is the owner of all rights, title, and interest in and to the '026 Patent, including the right to assert all causes of action arising under the '026 Patent and the right to any remedies for the past, current, and future infringement of the '026 Patent.

179. Microsoft is not licensed under the '026 Patent, either expressly or implicitly, nor does it enjoy or benefit from any rights in or to the '026 Patent whatsoever.

180. Microsoft has infringed and continues to directly infringe at least claim 1 of the '026 Patent in violation of 35 U.S.C. § 271(a), either literally or through the doctrine of equivalents, by making, using, selling, or offering for sale in the United States systems and methods that practice claims of the '026 Patent, including the Microsoft Advertising system.

181. Claim 1 illustrates the claims of the '026 Patent. It claims:

A computer-implemented method comprising:

identifying, by a computer system comprising one or more hardware processors, a set of agent actions in a server log generated by a content provider system in a network environment, wherein the set of agent actions are associated with a content of a network site of the content provider system, and wherein each agent action of the set of agent actions is associated with a combined identifier that includes: (i) an agent identifier of an agent that performed the agent action; and (ii) two or more parts of a domain name associated with the agent identifier;

processing, by the computer system, the set of agent actions to generate a set of

62

values, wherein the set of values represent an indication of quality of agent actions with the content presented on the network site, and wherein processing the set of agent actions includes:

measuring a velocity metric between at least two consecutive agent actions associated with the combined identifier; and

determining an elapsed time during which the agent associated with the combined identifier interacted with the content of the network site; and

generating, based on the set of values and by the computer system, an output identifying that one or more agent actions correspond to low quality interactions with the content presented on the network site.

182.    Microsoft's hardware processors collect agent actions from server logs generated by content provider systems through its use of UET and related tools, as explained above. It also associates agent identifiers with network parameters, as explained above.

183.    Microsoft's advertising system also develops a set of values indicating the "quality of agent actions." In doing so, it uses values such as a "velocity metric between at least two consecutive agent actions" and the "elapsed time during which the agent … interacted with the content of the network site." This is also outlined above.

184.    Finally, using all of this data, Microsoft uses a computer system to generate an output identifying that one or more of the clicks correspond to low quality clicks with the advertisement displayed on the publisher website. The Microsoft Advertising support page tells paying advertisers that Microsoft Advertising automatically categorizes clicks according to pre-determined parameters. Those

COMPLAINT

outputs indicate the quality of clicks on advertisements hosted on Microsoft platforms.

**Click quality definitions**
- **Defective clicks:** Clicks that have technical problems or defects that prevent them from being billable, but otherwise might reflect actual human activity. All defective clicks are non-billable.
- **Invalid clicks:** Clicks that fail to meet the minimum requirements outlined in the IAB Click Measurement Guidelines. Invalid clicks are a subset of low-quality clicks.
- **Low-quality clicks:** Clicks that Microsoft Advertising classifies as non-billable. Low-quality clicks originate from a variety of sources, including:
  - Clicks that suggest low commercial intent.
  - Clicks that have been identified as likely coming from automated bots.
  - Clicks that display unusual or suspicious patterns of behavior.

Source:    Microsoft Advertising, *Microsoft Advertising click measurement: Description of methodology*, https://help.ads.microsoft.com/#apex/ads/en/60220/0 (last accessed December 9, 2025).

185.   To the extent applicable, Plaintiff has complied with 35 U.S.C. § 287(a) with respect to the '026 Patent. Further, on information and belief, Microsoft has been on notice of the '026 Patent and its infringement since at least its issue date of November 14, 2023.

**SIXTH CAUSE OF ACTION: INFRINGEMENT OF U.S. PATENT NO. 12,284,103**

186.   Chandler Wilkinson repeats and incorporates by reference each preceding paragraph as if fully set forth herein and further states:

187.   On April 22, 2025, the United States Patent and Trademark Office duly and legally issued the '103 Patent entitled "Method and System for Scoring Quality of Traffic to Network Sites."

188.   On September 15, 2020, Joel Berman assigned all title, rights, and interest in and to U.S. Patent Application No. 18/483,324 to Chandler Wilkinson

64

LLC. The assignment was recorded with the United States Patent and Trademark Office on October 10, 2023.

189. Chandler Wilkinson is the owner of all rights, title, and interest in and to the '103 Patent, including the right to assert all causes of action arising under the '103 Patent and the right to any remedies for the past, current, and future infringement of the '103 Patent.

190. Microsoft is not licensed under the '103 Patent, either expressly or implicitly, nor does it enjoy or benefit from any rights in or to the '103 Patent whatsoever.

191. Microsoft has infringed and continues to directly infringe at least claim 1 of the '103 Patent in violation of 35 U.S.C. § 271(a), either literally or through the doctrine of equivalents, by making, using, selling, or offering for sale in the United States systems and methods that practice claims of the '103 Patent, including the Microsoft Advertising system.

192. Claim 1 illustrates the claims of the '103 Patent. It claims:

A computer-implemented method comprising:

identifying, by a computer system comprising one or more hardware processors, a set of agent actions in a server log,

wherein the set of agent actions comprises one or more clicks by agents when the agents interact via the Internet with an advertisement displayed on a publisher website, and wherein each agent action of the set of agent actions is associated with a combined identifier that includes:

(i) an agent identifier of an agent that performed the agent action; and
(ii) two or more parts of a domain name associated with the agent identifier;

processing, by the computer system, the set of agent actions to generate a set of values, wherein the set of values represent indications of quality of clicks on the advertisement displayed on the publisher website, and wherein processing the set of agent actions includes:

measuring an elapsed time between at least two consecutive clicks associated with the combined identifier; and

determining a velocity with which a click associated with the combined identifier occurs on the advertisement displayed on the publisher website; and

generating, based on the set of values and by the computer system, an output identifying that one or more of the clicks correspond to low quality clicks with the advertisement displayed on the publisher website.

193. As discussed above, Microsoft's click scoring technology retrieves agent actions from web server logs, and those agent interactions represent interactions between agents and advertisements on publisher websites.

194. As discussed above, Microsoft associates agent actions with a combined identifier that includes a unique agent identifier and two or more parts of a domain name, and scores those agent actions using elapsed time and velocity metrics.

195. Finally, using all of this data, Microsoft uses a "computer system" to generate "an output identifying that one or more of the clicks correspond to low quality clicks with the advertisement displayed on the publisher website."

196. As detailed above, Microsoft Advertising infrastructure infringes at least Claim 1 of the '103 Patent. Microsoft's acts of infringement have caused and continue to cause damage to Chandler Wilkinson, and Chandler Wilkinson is entitled to recover from Microsoft the damages it has sustained as a result of these wrongful

acts in an amount subject to proof at trial, but in no event less than a reasonable royalty, lost profits, and/or a lump sum through the expiration date of the '103 Patent, for the use made of the invention described and claimed in the '103 Patent, together with interest and costs as fixed by the Court.

197. Microsoft has undertaken these acts of infringement despite knowing that such actions infringe at least Claim 1 of the '103 Patent. Accordingly, Microsoft has willfully infringed and continues to willfully infringe at least Claim 1 of the '103 Patent.

198. To the extent applicable, Plaintiff has complied with 35 U.S.C. § 287(a) with respect to the '103 Patent. Further, on information and belief, Microsoft has been on notice of the '103 Patent and its infringement since at least its issue date of April 22, 2025.

**SEVENTH CAUSE OF ACTION: INFRINGEMENT OF U.S. PATENT NO. 12,265,989**

199. Chandler Wilkinson repeats and incorporates by reference each preceding paragraph as if fully set forth herein and further states:

200. On April 1, 2025, the United States Patent and Trademark Office duly and legally issued the '989 Patent entitled "Preservation of Scores of the Quality of Traffic to Network Sites Across Clients and Over Time."

201. On September 15, 2020, Joel Berman assigned all title, rights, and interest in and to U.S. Patent Application No. 18/466,570 to Chandler Wilkinson

67

COMPLAINT

LLC. The assignment was recorded with the United States Patent and Trademark Office on September 14, 2023.

202.   Chandler Wilkinson is the owner of all rights, title, and interest in and to the '989 Patent, including the right to assert all causes of action arising under the '989 Patent and the right to any remedies for the past, current, and future infringement of the '989 Patent.

203.   Microsoft is not licensed under the '989 Patent, either expressly or implicitly, nor does it enjoy or benefit from any rights in or to the '989 Patent whatsoever.

204.   Microsoft has infringed and continues to directly infringe at least claim 1 of the '989 Patent in violation of 35 U.S.C. § 271(a), either literally or through the doctrine of equivalents, by making, using, selling, or offering for sale in the United States systems and methods that practice claims of the '989 Patent, including the Microsoft Advertising system.

205.   Claim 1 illustrates the claims of the '989 Patent. It claims:

A method comprising:

receiving, by a computer system comprising one or more hardware processors, a first set of data that identifies a first plurality of clicks by a set of devices when the devices interact via a network environment with an advertisement displayed on a publisher website during a first time period, and a second set of data that identifies a second plurality of clicks by the set of devices when the devices interact via the network environment with the advertisement displayed on the publisher website during a second time period, wherein each click of the first plurality of clicks and the second plurality of clicks is associated with a combined identifier that includes: (i) a device identifier of a device of the set of devices; and (ii) at least two bytes of an IP address

associated with the device identifier;

assigning, by the computer system, values to the first plurality of clicks and the second plurality of clicks, wherein the values indicate quality of the clicks, and wherein assigning values to the clicks comprises, for each combined identifier:

measuring a velocity metric between at least two consecutive clicks associated with the combined identifier,

determining an elapsed time during which the device associated with the combined identifier interacted with the advertisement, and

assigning the values to clicks associated with the combined identifier based at least in part on the measured velocity metric and the elapsed time;

determining, by the computing system, that a first value assigned to the first plurality of clicks is higher than a second value assigned to the second plurality of clicks;

determining, by the computer system, that one or more first parameters associated with the first plurality of clicks overlap with one or more second parameters associated with the second plurality of clicks; and

in response to the determining that the one or more first parameters overlap with the one or more second parameters, modifying, by the computer system, the second value in accordance with the first value.

206. As explained above, Microsoft implements a computer system that receives data from web logs. That dataset comprises clicks by agents on an advertisement displayed on a publisher website. Microsoft then uses data-processing rules to process that network session data. It associates web operations with a unique device identifier and the IP address associated with the device identifier. In fact, an abandoned Microsoft Patent application—No. 2013/0346202 A1—explains that Microsoft's technology allows an agent's IP address to be "classified as belonging to

69

COMPLAINT

a unique or real end user, belonging to a proxy, or belonging to a potential exploit." Microsoft then assigns scores to those clicks based on metrics including velocity and elapsed time.

207.   To keep scores in a consistent ballpark over time, Microsoft compares data processing rules across multiple timeframes and uses a correction factor to create consistent scores that fit into the general score categorizations used by Microsoft Advertising: invalid or valid clicks.

208.   Machine learning systems update regularly to accommodate changes in patterns accompanying fraud; therefore, while the quality of clicks may objectively remain the same, it is possible that scores could fluctuate significantly depending on the metrics or thresholds used to determine click quality. Microsoft confirms that it uses machine learning techniques and human error-correction to assess update click quality assessments, and that these techniques are updated *as frequently as weekly*:

**Machine learning**

The amount of data used to train Microsoft Advertising machine learning models differ depending on the nature of the model and data availability. For some machine learning models, 100% of user activities is currently used. For other machine learning models, user activities are sampled. Currently, both approaches are done over a period of 1 week. Microsoft Advertising employs both supervised and unsupervised machine learning models, such as deep neural networks, tree-based models, and more. Systems and processes are in place to ensure machine learning models are performing properly. These rely on human activities including ongoing alert-based investigation, quarterly machine learning model review, and machine learning training label corrections. New machine learning model development occurs as frequently as weekly.

**Nature and scope of process and transaction auditing exercised**

On a periodic basis, internal and external auditors perform procedures to get comfort over the transactions and processes employed in invalid traffic detection.

Source:     Microsoft Advertising, *Microsoft Advertising click measurement: Description of methodology*, https://help.ads.microsoft.com/#apex/ads/en/60220/0 (last accessed December 10, 2025).

COMPLAINT

209.   This understanding is confirmed by public customer support provided to Microsoft Advertising customers. By way of example, in September of 2014, an advertiser reported seeing more than an 80% increase in fraudulent clicks. Microsoft escalated the concern to its Traffic Quality team; a clear "first period" versus "second period" comparison in fraudulent traffic rates. *Request for Refund of Fake and Fraudulent Clicks*, https://learn.microsoft.com/en-us/answers/questions/2288885/request-for-refund-of-fake-and-fraudulent-clicks (September 1, 2024) (last accessed March 2, 2026).

210.   On information and belief, Microsoft makes these scoring adjustments because it uses machine learning tools to determine that a first set of clicks were consistently scored higher than a second set of clicks, and standardizes the scores across those clicks by adjusting for the changed rule sets responsible for the score alteration. Microsoft therefore must bring new scores into line with old scores to avoid creating massive disruption in its advertising network every time it updates its rule sets.

211.   Microsoft's advertising system corrects click categorizations when it determines that click values from one hour are higher or lower than the values for another hour due to a change in the scoring algorithm. If the algorithm remained constant, the click scores would remain roughly the same—but that would lead to inaccurate scoring results because Microsoft's machine learning or human-correction system determines that certain clicks are incorrectly scored. Therefore, to standardize

COMPLAINT

click quality—e.g., accurately characterize all clicks as either high or low quality—Microsoft must compare the results from the first time period, using the first algorithm, to the results from the second time period, using the second (updated) algorithm.

212. After determining how the scores change based on the machine-learning induced algorithm alterations, Microsoft can then standardize its scores across both timeframes, thereby ensuring that click quality scoring remains constant and effective. The alternative—not modifying scores across time periods after algorithm changes—could lead to dramatically different numbers of clicks being flagged as high or low quality depending on the evolution of the machine learning system.

213. As one third-party explained, Microsoft Advertising uses "several layers of protection" against click fraud in addition to real-time filtering:

COMPLAINT

**2) Machine learning:**

It involves continuously learning from new fraud patterns and historical data.

**3) Manual review teams:**

Sophisticated teams manually review reports of unusual behavior.

**4) Post-click analysis:**

Discovered invalid clicks are removed, and advertisers can be reimbursed.

Source: ClickPatrol, *Bing Ads click fraud: How to detect, stop, and protect your PPC budget in 2025,* https://clickpatrol.com/bing-ads-click-fraud-how-to-detect-stop-and-prot/#how-bing-ads-handles-click-fraud (last accessed December 11, 2025).

214. And Microsoft confirms that it uses after-the-fact data analysis applied to an earlier subset of clicks to determine whether it needs to update its click scoring model:

When a user clicks an ad, it can take up to two hours for the system to process the click (3 hours for conversions) and make it available for reporting. Data is generally considered complete with books closed after 3 hours. In some exception cases due to invalid traffic, there could be unexpected adjustments that might take a week or more to resolve. For example, if an advertiser complaint identifies invalid click activity that escaped the automated filtration system, the Traffic Quality and support teams will process a credit to the advertiser's account, and will partner with internal teams to determine whether they can update automated systems in order to improve detection in the future. For more information, please see Traffic Quality Center ⬀ .

COMPLAINT

Source: Microsoft Advertising, Reporting Service Model, https://learn.microsoft.com/en-us/advertising/guides/reports?view=bingads-13 (last accessed December 11, 2025).

215.  This score-correction process is essential for Microsoft's advertising model. Without a method to standardize click scores across time periods and retroactively correct incorrectly scored clicks using a uniform score framework, advertisers would either (1) not be able to trust that Microsoft was correctly scoring clicks based on updated information, or (2) see dramatic shifts in click scores over time as Microsoft's scoring algorithm evolves.

216.  Microsoft also identifies rules that correspond to low quality interactions and then uses the designated data to train the computer system, increasing the future accuracy of the system in detecting low-quality traffic. Microsoft explicitly states that it uses "activity based rules" and "machine learning" to detect sophisticated invalid traffic:

> **Sophisticated invalid traffic**
> Microsoft Advertising has implemented Sophisticated Invalid Traffic (SIVT) detection procedures in line with those defined by the MRC SIVT filtration requirements. Sophisticated invalid traffic consists of more difficult to detect situations that require advanced analytics, multi-point corroboration/coordination, significant human intervention, etc., to analyze and identify. SIVT filtration methods are based on activity-based rules, machine learning, and the results of human investigations.

Source: Microsoft Advertising, *Microsoft Advertising click measurement: Description of methodology*, https://help.ads.microsoft.com/#apex/ads/en/60220/0 (last accessed February 10, 2025)

217.  Microsoft also explains that it uses user activities to conduct "label corrections," and that it updates its models "as frequently as weekly"—meaning, on information and belief, that it selects representative samples of web traffic and

74

identifies rules likely to result in high- and low-quality interactions, and uses those samples to train its computer systems.

218. Microsoft's billing model confirms that it modifies more recent scores in accordance with its previous scoring regimen to maintain consistency. Microsoft explains that while it attempts to "eliminate and not bill for low-quality clicks within the hour," it is occasionally unable to detect invalid clicks until later—presumably, when the click scoring framework has been updated with some new machine learning or human-generated information, such as a blacklisted IP address or an update to the click-velocity threshold. In such cases, Microsoft credits the charges for the invalid clicks to future bills.

**Post-report billing adjustments**
Microsoft Advertising makes every effort to eliminate and not bill for low-quality clicks within the hour, so that reports can be posted with all low-quality clicks removed. However, Microsoft Advertising occasionally does not detect low-quality clicks until after the hour's data has been processed.

In these situations, it is no longer possible to go back and ignore the invalid clicks, as it was when the hour's data was being processed. Instead, Microsoft Advertising issues a billing adjustment in which it credits the charges for clicks that were found to be invalid. These credits are displayed on the billing report as adjustments.

**ClickIDs and third-party or in-house reporting for advertisers**
Third-party landing page scripts and other in-house web server logs can be used to count clicks. However, by using Microsoft Advertising ClickIDs you can more accurately count the measured clicks by differentiating them from repeated user page views. Note that not all web analytics programs support ClickIDs.

Source: Microsoft Advertising, *Microsoft Advertising click measurement: Description of methodology*, https://help.ads.microsoft.com/#apex/ads/en/60220/0 (last accessed February 10, 2025)

219. By recognizing that traffic initially flagged as valid (and billed accordingly) is, in reality, invalid or low-quality, Microsoft essentially re-assigns that traffic with a new score consistent with its old scoring system. In other words,

75

Microsoft recategorizes traffic from "valuable" to "non-valuable," and issues refunds accordingly.

220. Microsoft's acts of infringement have caused and continue to cause damage to Chandler Wilkinson, and Chandler Wilkinson is entitled to recover from Microsoft the damages sustained as a result of Microsoft's wrongful acts in an amount subject to proof at trial. In any event, such recovery should be no less than a reasonable royalty, lost profits, and/or a lump sum through the expiration date of the '989 Patent, for the use made of the invention claimed in the '989 Patent, together with interest and costs as fixed by the Court.

221. Microsoft has undertaken these acts of infringement despite knowing that such actions infringe at least claim 1 of the '989 Patent. Accordingly, Microsoft has willfully infringed and continues to willfully infringe at least claim 1 of the '989 Patent.

222. To the extent applicable, Plaintiff has complied with 35 U.S.C. § 287(a) with respect to the '989 Patent. Further, on information and belief, Microsoft has been on notice of the '989 Patent and its infringement since at least its issue date of April 1, 2025.

**JURY DEMAND**

223. Chandler Wilkinson demands a trial by jury on all issues.

COMPLAINT

## **PRAYER FOR RELIEF**

224.    WHEREFORE, Chandler Wilkinson requests entry of judgment in its favor and against Defendant Microsoft as follows:

A.    Declaring that Microsoft has misappropriated trade secrets under both the DTSA, 18 U.S.C. § 1836, and the CUTSA, Cal. Civ. Code § 3426.

B.    Declaring that Microsoft has infringed, and continues to infringe, the Asserted Patents.

C.    Awarding lost profits and/or reasonable royalty damages to Plaintiff in an amount no less than a reasonable royalty for Microsoft's misappropriation of the trade secrets and infringement of the Asserted Patents, together with prejudgment and post-judgment interest and costs as permitted under 35 U.S.C. § 284;

D.    Awarding Plaintiff the trebling of any and all damages awarded by reason of Microsoft's willful infringement of the Asserted Patents, pursuant to 35 U.S.C. § 284.

E.    Awarding Plaintiff with unjust enrichment obtained by Microsoft as a result of its unlawful misappropriation and use of Plaintiff's intellectual property;

F.    Awarding attorneys' fees pursuant to 35 U.S.C. § 285 or as otherwise permitted by law;

G.    Ordering Microsoft to pay supplemental damages to Plaintiff, including any ongoing royalties and interest, with an accounting, as needed;

H.    Enjoining Microsoft from practicing the Asserted Patents; and

COMPLAINT

I.      Awarding such other costs and further relief as the Court may deem just and proper.


Dated: March 6, 2026.

Rohit Nath
(CSB: 316062)
Shawn Blackburn
(*pro hac vice forthcoming*)
Elisha Barron
(*pro hac vice forthcoming*)
Nicholas C. Carullo
(*pro hac vice forthcoming*)
Dylan Salzman
(*pro hac vice forthcoming*)
SUSMAN GODFREY L.L.P.


By: /s/  Rohit Nath


*Attorneys for Plaintiff Chandler Wilkinson LLC*

COMPLAINT